IN RE T.R., A JUVENILE.

THE STATE, EX REL. DISPATCH PRINTING COMPANY, APPELLEE, v. SOLOVE, JUDGE, ET AL., APPELLANTS.

[Cite as In re T.R. (1990), 52 Ohio St. 3d 6.]

(Nos. 89-1302 and 89-1303—Submitted February 21, 1990—
Decided June 13, 1990.)

*Jones, Day, Reavis & Pogue, John W. Zeiger, Robert W. Hamilton* and *Steven J. McDonald,* for appellee.

*S. Michael Miller,* prosecuting attorney, and *Jeffrey Glasgow,* for appellant Judge Ronald Solove.

*James Kura,* county public defender, *Paul Skendelas, Delligatti, Hollenbaugh, Briscoe & Milless* and *Charles K. Milless,* for appellant Tessa Reams.

*Baker & Hostetler, David L. Marburger* and *Susan M. Gilles,* urging affirmance for *amici curiae,* Ohio Newspaper Assn. et al.

*Beverly Seymour, pro se,* urging affirmance as *amicus curiae.*

*S. Farrell Jackson,* urging reversal for *amicus curiae,* Ohio Association of Juvenile and Family Court Judges.

*Harry R. Reinhart,* urging reversal for *amicus curiae,* Ohio Association of Criminal Defense Lawyers.

*Benesch, Friedlander, Coplan & Aronoff* and *Stephen D. Williger,* urging reversal for *amici curiae,* Federation for Community Planning et al.

H. BROWN, J. This case presents a question of first impression for us: what standard should be applied by a juvenile court judge in ruling on motions to restrict public access to custody and dependency proceedings? The restrictions in the instant case take two forms: a "closure order" which bars the public from attending the trial, and a so-called "gag order" which prohibits the adult parties from discussing the case, and thus indirectly restricts public access by depriving the media of a source of news.

For the reasons which follow, we find that the orders issued by appellant Judge Solove were, with some modification, supported by the evidence under the standard which we herein adopt.

## I
### PROCEDURAL ISSUES

The Dispatch and the court below appear to have been uncertain of whether an appeal or a writ of prohibition should be used to seek review of the closure and gag orders. Extraordinary writs, such as the writ of prohibition, are not available to review a trial court's actions when the party seeking the writ has a plain and adequate remedy at law by way of an appeal. See *DuBose* v. *Trumbull Cty. Court of Common Pleas* (1980), 64 Ohio St. 2d 169, 171-172, 18 O.O. 3d 385, 387, 413 N.E. 2d 1205, 1208. Here, however, the Dispatch has no remedy by way of an appeal. Interlocutory closure and gag orders are not final, appealable orders. Though they involve substantial rights, they do not determine the action and prevent a

judgment in favor of a party to the action. See R.C. 2505.02. While the parties themselves may ultimately appeal from the trial court's final judgment and assign as error the imposition or nonimposition of a closure or gag order, see *State, ex rel. Fyffe*, v. *Pierce* (1988), 40 Ohio St. 3d 8, 531 N.E. 2d 673, the Dispatch cannot do so because it is not a party to the action. Even if the Dispatch did have standing to appeal from the final judgment, it would not have an adequate remedy because the proceeding to which it seeks access would be over before the appeal could be taken.

Our cases have long held that prohibition is an appropriate remedy to prevent enforcement of an order improperly restricting the access of press and public to court proceedings. *State, ex rel. Dayton Newspapers, Inc.*, v. *Phillips* (1976), 46 Ohio St. 2d 457, 75 O.O. 2d 511, 351 N.E. 2d 127, paragraph one of the syllabus; see, also, *State, ex rel. Beacon Journal Publishing Co.*, v. *Kainrad* (1976), 46 Ohio St. 2d 349, 75 O.O. 2d 435, 348 N.E. 2d 695; *State, ex rel. The Repository*, v. *Unger* (1986), 28 Ohio St. 3d 418, 28 OBR 472, 504 N.E. 2d 37. Because its right to gather news and its right to attend a public proceeding are impaired by such an order, the press has standing to bring an action in prohibition to challenge its validity. See *Dayton Newspapers, supra,* at paragraph two of the syllabus; *Repository, supra,* at 419, 28 OBR at 473, 504 N.E. 2d at 39.[4] Accordingly, we reaffirm our prior decisions and hold that interlocutory orders of a trial court restricting public access to pending litigation are not final, appealable orders, and may be challenged during the pendency of the litigation only through an action for a writ of prohibition. Members of the press and public who seek access to a closed court proceeding have standing to seek a writ of prohibition for this purpose.

II
THE STANDARD FOR DETERMINING PUBLIC ACCESS TO JUVENILE COURT PROCEEDINGS

The parties vigorously disagree on whether Judge Solove applied the correct standard and properly allocated the burden of proof when deciding to close the courtroom and place the parties under a gag order. The disagreement is complicated by the fact that Judge Solove appears to have used two different standards. In pronouncing his decision on the gag order from the bench, he said, "So long as there is a scintilla of possibility of harm to the child, this Court will restrict the rights of the adults involved. And it is clear to me that there is at least a real possibility that the continued attention to this matter will result in harm to the child." In the written opinion on the closure order, the judge stated that there was "a presumption in favor of the openness of all judicial proceedings" which could only be overcome "where a competing, overriding interest is found to exist and the preservation of that overriding interest necessitates invasion of the first amendment rights * * *."

The precise question before us has not been passed upon by either this court or the United States Supreme

---

[4] While challenges to restrictions on access to courtrooms are typically brought by journalists acting as *de facto* representatives of the public, nothing prevents persons other than journalists from assuming this role. See *Barron* v. *Florida Freedom Newspapers, Inc.* (Fla. 1988), 531 So. 2d 113, 118.

Court; however, questions of the public's constitutional right of access to court proceedings in criminal prosecutions have been the subject of several decisions. We begin our discussion with a review of the case law.

## A
### The Public's Constitutional Right of Access to Judicial Proceedings in Criminal Prosecutions

In *Press-Enterprise Co. v. Superior Court* (1986), 478 U.S. 1 (*"Press-Enterprise II"*), the United States Supreme Court, following a line of cases beginning with *Richmond Newspapers, Inc.* v. *Virginia* (1980), 448 U.S. 555, held that there is a federal constitutional right of access to proceedings in a criminal prosecution which have "historically been open to the press and general public" and in which "public access plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II, supra,* at 8. "* * * If the particular proceeding in question passes these tests of experience and logic, a qualified First Amendment right of public access attaches.* * *" *Id.* at 9. The proceeding is presumed open to the press and public. "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. * * *" *Press-Enterprise Co.* v.

*Superior Court* (1984), 464 U.S. 501, 510 (*"Press-Enterprise I"*). A case-by-case determination on the necessity of closure is required. *Globe Newspaper Co.* v. *Superior Court* (1982), 457 U.S. 596, 607-608.

After reviewing the relevant authorities, we have concluded that the *Press-Enterprise II* test of "experience and logic" accurately defines the limits of constitutionally protected public access to all court proceedings. See *Cincinnati Gas & Elec. Co.* v. *General Elec. Co.* (C.A.6, 1988), 854 F. 2d 900, certiorari denied *sub nom. Cincinnati Post* v. *General Elec. Co.* (1989), 489 U.S. ___, 103 L. Ed. 2d 229, 109 S. Ct. 1171 (using *Press-Enterprises II* test to determine public right of access to civil case). Accordingly, we adopt this test and hold that the public's qualified right of access attaches to those hearings and proceedings in all courts which have historically been open to the public, and in which public access plays a significant positive role.[5]

## B
### The Right of Public Access Under the Open Courts Provision of the Ohio Constitution

In *State, ex rel. The Repository,* v. *Unger, supra,* we recognized that a qualified right of access is also embraced by Section 16, Article I of the Ohio Constitution,[6] the "open courts" provision of our Bill of Rights. Public access to criminal trials is also sup-

---

[5] Our decision in *State, ex rel. Plain Dealer Publishing Co.,* v. *Hamilton Cty. Court of Common Pleas* (1989), 44 Ohio St. 3d 602, 542 N.E. 2d 1102, is not inconsistent with this view. See *Richmond Newspapers, supra,* at 580, fn. 17; Comment, The First Amendment Right of Access to Civil Trials After *Globe Newspaper Co.* v. *Superior Court* (1984), 51 U. Chi. L. Rev. 286, 294-298.

[6] This provision states in pertinent part:

"All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

ported by the constitutional right of the accused to a public trial. "The underlying premise of a public trial is that the public is a party to all criminal proceedings. Criminal cases are prosecuted in the name of the people because crimes are public wrongs affecting all members of society.* * *" *Id.* at 420, 28 OBR at 474, 504 N.E. 2d at 39.

The Dispatch and its supporting *amici* argue that the "open courts" provision creates a qualified right of public access to *all* court proceedings, a broader right than that embraced by the free speech provisions of the First Amendment and Section 11, Article I of the Ohio Constitution. On the other side, appellants and their supporting *amici* contend that the open courts provision creates no presumption of public access to proceedings which have historically been closed.

Though the open courts provision has been a part of our Constitution since Ohio was admitted to the Union, we cannot resolve this issue by reference to the debates and comments of the drafters. The records of the 1802 convention indicate that the original open courts provision, Section 7, Article VIII, Constitution of 1802, was enacted without amendment or discussion. See *E.W. Scripps Co.* v. *Fulton* (1955), 100 Ohio App. 157,

171-172, 60 O.O. 147, 155, 125 N.E. 2d 896, 908 (Hurd, J., concurring). At the 1850-1851 convention, this section was carried into the current Bill of Rights unchanged, *id.* at 172, 60 O.O. at 155, 125 N.E. 2d at 906, and without discussion relating to the question of public access.[7] The 1873-1874 constitutional convention made no changes in this section, and the 1912 convention also left the words of the 1802 drafters unaltered, though it added a sentence not at issue in the instant case. *Id.*

We also cannot resolve this issue by simplistically viewing the phrase "[a]ll courts shall be open" as an absolute command applicable in all courts in all situations. It is a hallmark of American constitutional jurisprudence that many provisions of our Constitutions, though phrased in absolute terms, do not create absolute rights. For example, though the First Amendment's guarantee of freedom of speech is phrased in absolute terms, it "would not protect a man in falsely shouting fire in a theatre and causing a panic." *Schenck* v. *United States* (1919), 249 U.S. 47, 52. Nor would it protect a seller of obscene material, *Roth* v. *United States* (1957), 354 U.S. 476, or one who defames another with actual malice, *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254.

Certain phases of Ohio court pro-

---

[7] According to the convention record:

"[Convention delegate] MR. RANNEY said he perceived that the [Standing] Committee [on the Preamble and Bill of Rights] had left out of this report a number of articles in the old bill of rights. He had copied one of them, and would move its adoption as an additional section, as follows:

" 'Sec. ____. That all courts shall be open, and every person, for any injury done him, in his lands, goods, person, or reputation, shall have remedy by the due course of

law, and right and justice administered without denial or delay.'

"MR. HITCHCOCK of Geauga, had no objection, to the amendment, if it could be carried out. Justice should certainly be administered without denial or delay, but delay could not possibly be avoided in the Courts, unless they could have a gag-law there, as well as in this body. [A laugh.]

"The section was agreed to." 2 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio (1851) 337.

ceedings — such as grand jury hearings, petit jury deliberations, conferences in chambers, the issuance of search warrants, and the conferences of collegial courts such as ours — have been closed to the public both before and after the adoption of our Constitution.

For example, the grand jury has been used in Ohio criminal jurisprudence since the first Court of General Quarter Sessions was held in Marietta in 1788. A History of the Courts and Lawyers of Ohio (1934) 51-52. Grand jury hearings were closed to public access in the days of the English common law, 1 LaFave & Israel, Criminal Procedure (1984) 602-603, Section 8.2(a), and have remained presumptively closed to this day, see *Petition for Disclosure of Evidence* (1980), 63 Ohio St. 2d 212, 17 O.O. 3d 131, 407 N.E. 2d 513. If the drafters had intended the open courts provision to create an absolute right of public access, these grand jury proceedings could not be closed to the public.

The Dispatch relies heavily for its support on our *per curiam* opinion in *Repository, supra.*[8] In that case, we reviewed the propriety of orders restricting press access to pretrial hearings in two separate murder prosecutions in the common pleas court. (The court below erroneously stated in its. opinion that *Repository* involved a juvenile delinquency proceeding.) Consistently with the United States Supreme Court's opinions in *Press-Enterprise I* and *II,* we held that the

public's qualified right of access extends to pretrial proceedings in criminal cases. *Repository, supra,* at 421, 28 OBR at 475, 504 N.E. 2d at 40.

*Repository* did not find a public right of access to criminal prosecutions any greater than that derived from the First Amendment in *Richmond Newspapers* and *Press-Enterprise I* and *II.* While our opinion did not limit its holding to criminal prosecutions, it also makes no mention of non-criminal proceedings, except for a concurring opinion which notes that "[t]here are * * * functions of the judicial system which * * * do not come within the realm of the constitutional guarantee of open courts. Grand jury sessions, the exclusion of witnesses during trial, jury deliberations, conferences of collegial courts, and certain juvenile hearings are some of these. * * *" *Repository, supra,* at 425, 28 OBR at 479, 504 N.E. 2d at 43 (Celebrezze, C.J., concurring).

We conclude that the open courts provision of the Ohio Constitution creates no greater right of public access to court proceedings than that accorded by the Free Speech and Free Press Rights Clauses of the First Amendment to the United States Constitution and the analogous provisions of Section 11, Article I of the Ohio Constitution.

## C

### Application of the *Press-Enterprise II* Balancing Test to Dependency and Custody Proceedings in Juvenile Courts

The juvenile court as we know it

---

[8] The Dispatch also cites *State* v. *Lane* (1979), 60 Ohio St. 2d 112, 14 O.O. 3d 342, 397 N.E. 2d 1338. In *Lane,* we held that a criminal trial conducted within the walls of a prison violated the defendant's rights to due process and a fair public trial. *Id.* at paragraphs one and two of the syllabus.

While we did cite the open courts provision in a footnote, *id.* at 119, 14 O.O. 3d at 347, 397 N.E. 2d at 1343, fn. 2, our opinion was concerned with the abridgment of the *defendant's* right to a public trial, and did not discuss the *public's* right to attend.

today did not exist at common law, though it has roots in the common-law doctrine of *parens patriae*, which made the courts of chancery responsible for the protection of infants. Whitlatch, The Juvenile Court — A Court of Law (1967), 18 Case W. Res. U. L. Rev. 1239, 1241; see, also, Young, A Synopsis of Ohio Juvenile Court Law (1962), 31 U. Cin. L. Rev. 131, 133. The first juvenile court in Ohio was established in Cuyahoga County by the General Assembly in 1902. *In re Agler* (1969), 19 Ohio St. 2d 70, 73, 48 O.O. 2d 85, 87, 249 N.E. 2d 808, 810; Young, *supra*, at 135. Subsequent enactments in 1904 and 1906 created a statewide system of specialized juvenile courts. *Agler, supra*, at 73, 48 O.O. 2d at 87, 249 N.E. 2d at 810; Young, *supra*, at 135. The juvenile court was originally created to deal with children who violated criminal laws, see, generally, Whitlatch, *supra*; Young, *supra*, but its jurisdiction has expanded to include, *inter alia*, children who are abused, neglected, or dependent, and to determine the custody of any child not a ward of another court of the state. R.C. 2151.23(A).

Juvenile courts differ significantly from courts of general jurisdiction. The mission of the juvenile court is to act as an insurer of the welfare of children and a provider of social and rehabilitative services. R.C. 2151.01; *McKeiver* v. *Pennsylvania* (1971), 403 U.S. 528, 546, fn. 6, and at 551-552 (White, J., concurring); *In re Gault* (1967), 387 U.S. 1, 15-16; *Kent* v. *United States* (1966), 383 U.S. 541, 554-555; *In re M.D.* (1988), 38 Ohio St. 3d 149, 153, 527 N.E. 2d 286, 289-290; *Agler, supra*, at 73, 48 O.O. 2d at 87, 249 N.E. 2d at 810-811; Whitlatch, *supra*, at 1241. Consequently, juvenile courts have adopted unique methods of conducting their proceedings. Hear-

ings are informal, and based on an inquisitorial model rather than an adversarial one. R.C. 2151.35; *State* v. *Shardell* (1958), 107 Ohio App. 338, 340-341, 8 O.O. 2d 262, 264, 153 N.E. 2d 510, 512; Pound, The Place of the Family Court in the Judicial System (1964), 10 Crime and Delinquency 532, 542; Whitlatch, *supra*, at 1246-1247; see, also, *McKeiver, supra*, at 545 (juvenile procedure is based on "the idealistic prospect of an intimate, informal protective proceeding"). Juvenile proceedings are usually private. *Smith* v. *Daily Mail Publishing Co.* (1979), 443 U.S. 97, 105; *id.* at 107 (Rehnquist, J., concurring); *In re Oliver* (1948), 333 U.S. 257, 266, fn. 12; *Agler, supra*, at 73, 48 O.O. 2d at 87, 249 N.E. 2d at 811. Juvenile court records are confidential. Juv. R. 37(B); see, also, Juv. R. 32(B) (mental and physical examinations of children pursuant to court order may not be used for other purposes); R.C. 2151.18(B) and (C) (those juvenile court records which are open to the public shall not include the identity of any party to a case); R.C. 5153.17 (records of investigations by public children's services agencies on abused, neglected, and dependent children are confidential); *Gault, supra*, at 25 ("there is no reason why, consistently with due process, a State cannot continue * * * to provide and to improve provision for the confidentiality of records * * * relating to juveniles").

The United States Supreme Court has repeatedly recognized that juvenile court proceedings have historically been closed to the public. *Smith, supra*, at 105 ("all 50 states have statutes that provide in some way for confidentiality" in juvenile proceedings); *Davis* v. *Alaska* (1974), 415 U.S. 308, 319 (state has an interest "to seek to preserve the anonymity of a juvenile offender"); *Kent, supra*, at

556 (juvenile offenders are "shielded from publicity" by statute). Further, it seems clear that public access to such proceedings does not *necessarily* play a positive role in the juvenile court process.

With regard to delinquent children, "* * * it is the law's policy 'to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past.' * * *" *Gault, supra,* at 24. A delinquent child is not considered a criminal, and the civil disabilities ordinarily following a criminal conviction do not attach. *Gault, supra; Agler, supra,* at 73, 48 O.O. 2d at 87, 249 N.E. 2d at 811. A delinquent child who has successfully been rehabilitated may apply to have the record of his case sealed, R.C. 2151.358(D), and the court may order that "the proceedings in which the person was adjudicated a delinquent * * * child be deemed never to have occurred. * * *" R.C. 2151.358(E).

The need for confidentiality is even more compelling in the case of a child who is abused, neglected, or dependent. The delinquent child is at least partially responsible for the case being in court; an abused, neglected, or dependent child is wholly innocent of wrongdoing. While the public arguably has an interest in delinquency proceedings which is analogous to its interest in criminal proceedings, see *Repository, supra,* at 420, 28 OBR at 474, 504 N.E. 2d at 39 (public has qualified right of access because "the public is a party to all criminal proceedings"), this interest is not present in abuse, neglect, and dependency proceedings. Additionally, the effectiveness of the statutes and rules mandating confidentiality of the records of juvenile courts and children's services agencies would be destroyed if the public were allowed access to the proceedings in which the confidential records are generated.

Custody proceedings in the juvenile court would benefit little from public access.[9] Custody disputes generally require the courts to delve into the private relations of parents and children. While curiosity may be incited by custody cases involving bizarre facts or famous persons, this does not necessarily translate into a significant positive public role. "* * * [W]e perceive a clear distinction between mere curiosity, or the undeniably morbid or prurient intrigue with scandal or with the potentially humorous misfortune of others, on the one hand and real public or general concern on the other." (Emphasis deleted.) *Firestone* v. *Time, Inc.* (Fla. 1972), 271 So. 2d 745, 748.

We do not suggest that the public has no legitimate interest in obtaining access to juvenile proceedings, or that public participation does not play a significant positive role in the juvenile court process. As with all operations of government, the public has an interest in scrutinizing the working of the juvenile court. *In the Matter of N.H.B.* (Utah App. 1989), 769 P. 2d 844, 849. Public access to the juvenile court process can promote informed public involvement in government and enhance public confidence in the judicial

---

[9] We refer here *only* to those custody proceedings initiated in the juvenile court pursuant to R.C. 2151.23(A)(2). Most child custody adjudications are made by the domestic relations court as part of a divorce or dissolution of marriage. While we need not decide the question today, we note that other courts have held that divorce actions, like other adult civil actions, are presumptively open to the public. See, *e.g., Barron, supra,* at 118-119.

branch. *Id.* at 851. These are important interests which should be considered before any juvenile judge decides to restrict public access to the courtroom. However, given the General Assembly's selection of a system of juvenile courts which depends for its effectiveness on confidentiality, these interests are not sufficient to create a *presumption* of openness.

Accordingly, we conclude that there is no qualified right of public access to juvenile court proceedings to determine if a child is abused, neglected, or dependent, or to determine custody of a minor child.

## D

### The Standard for Restricting Press Access to Dependency and Custody Proceedings in Juvenile Courts

Having determined that there is no presumption in favor of public access and, consequently, that the "overriding interest" test of *Press-Enterprise I* does not apply, we must decide what standard should be used to balance the public's interest in access against the parties' interest in confidentiality.

We look first to the relevant provisions of the Revised Code and the Rules of Juvenile Procedure. R.C. 2151.35(A) provides that "* * * [i]n the hearing of any case, the general public *may* be excluded and only those persons admitted who have a direct interest in the case." (Emphasis added.) Nearly identical language is found in Juv. R. 27. In *State, ex rel. Fyffe,* v. *Pierce, supra,* we held that these provisions authorize, but do not require, closure of the hearing. This is in contrast to the statutes governing adoptions and involuntary hospitalization for mental illness, which mandate a closed hearing. R.C. 3107.17(A) (adoption: "All hearings * * * shall be held in closed court * * *."); 5122.15(A)(5) (mental illness: "The hearing shall be

closed to the public, unless counsel for the respondent, with the permission of the respondent, requests that the hearing be open * * *."). Though the General Assembly has clearly adopted a policy of confidentiality in the juvenile courts, it has not expressly mandated closure of juvenile hearings.

We need not decide the General Assembly's constitutional authority to enact a statute making juvenile court proceedings presumptively closed. However, we note that courts in four states with open courts provisions similar to ours in their constitutions have held presumptive closure statutes to be constitutional. *In the Matter of Adoption of H.Y.T.* (Fla. 1984), 458 So. 2d 1127 (adoption proceedings); *Courier-Journal* v. *F.T.P.* (Oct. 27, 1989), Ky. App. Nos. 88-CA-1489-MR and 88-CA-1490-MR, unreported, petition for review denied (April 18, 1990), Ky. Supreme Ct. No. 89-SC-874-MR (juvenile proceedings); *Ex parte Columbia Newspapers, Inc.* (S.C. 1985), 333 S.E. 2d 337 (juvenile proceedings presumptively closed unless challenged); *In the Matter of N.H.B., supra* (juvenile hearings); see, also, *F.T.P.* v. *Courier-Journal* (Ky. 1989), 774 S.W. 2d 444 (closure statute permits press to be excluded from appellate level of juvenile proceedings). Courts in four other states have upheld presumptive closure statutes governing juvenile hearings against First Amendment challenges. *Florida Publishing Co.* v. *Morgan* (1984), 253 Ga. 467, 322 S.E. 2d 233; *State in the Interest of D.B.* (1981), 181 N.J. Super. 586, 439 A. 2d 94; *Edward A. Sherman Publishing Co.* v. *Goldberg* (R.I. 1982), 443 A. 2d 1252; *In re J.S.* (Vt. 1981), 438 A. 2d 1125; see, also, *In the Matter of Robert M.* (Family Ct. 1981), 109 Misc. 2d 427, 439 N.Y. Supp. 2d 986 (juvenile court rule providing for selective exclusion of press at judge's discretion is constitutional).

In the absence of a statute, we conclude that juvenile court proceedings to determine if a child is abused, neglected, or dependent, or to determine custody of a minor child, are neither presumptively open nor presumptively closed to the press and public.

Because there is no presumption, the juvenile court must, in each case, weigh the competing interests for and against public access. As we have said, the public has an important interest in observing the working of the juvenile court. Access can promote informed public discussion and lead to more intelligent responses to problems and issues.

On the other hand, public access to juvenile court proceedings may have harmful effects. When the evidence presented at a juvenile hearing is given wide coverage in the press, the effectiveness of the confidential records statutes and rules is weakened. Public access has the potential to endanger the fairness of the proceeding or disrupt the orderly process of adjudication. Finally, intense publicity surrounding the events which have brought a child into the juvenile court may psychologically harm the child, making it more difficult, if not impossible, for the child to recover from those events. See *Smith, supra,* at 108, fn. 1 (Rehnquist, J., concurring).

Harmful psychological effects are difficult to measure, and nearly impossible to predict. Thus, the "substantial probability" standard articulated by the court below would render the juvenile court powerless to shield a child from threatened psychological harm. Due to the inexact nature of modern psychological science, this standard effectively requires that the child suffer measurable harm before the court can act. While the public's interest in access is important and de-

serving of protection, the state also has a compelling interest in the protection of children. *State* v. *Young* (1988), 37 Ohio St. 3d 249, 257, 525 N.E. 2d 1363, 1372. The "substantial probability" standard gives insufficient weight to this interest, leaving the juvenile court unable to prevent an innocent child from being made a public spectacle and being psychologically maimed by the very process which is intended to help the child.

On the other hand, we decline to adopt the "scintilla of possibility of harm" standard used by Judge Solove in his gag order ruling, or the "best interests of the child" standard advanced by appellants and their supporting *amici.* The nature of the misfortunes which bring children to the juvenile court are such that there is almost always a "scintilla of possibility of harm to the child" from public access. Further, given the policies behind the juvenile court's lengthy history of confidentiality, it is possible to reasonably argue that public access is *never* in any child's best interest. We believe these standards give insufficient weight to the public's interest in access.

A proper standard is one which gives due deference to both the limitations of our ability to predict harmful consequences which may result from public access and the public's interest in learning about and scrutinizing the working of the juvenile court. Accordingly, we hold that the juvenile court may restrict public access to its proceedings in abuse, neglect, dependency and custody cases pursuant to Juv. R. 27 and R.C. 2151.35 if, after hearing evidence and argument on the issue, it finds that: (1) there exists a reasonable and substantial basis for believing that public access could harm the child or endanger the fairness of the pro-

ceeding, and (2) the potential for harm outweighs the benefits of public access.

### III
### VALIDITY OF THE ORDERS ISSUED IN THE INSTANT CASE

The restrictions on public access imposed by Judge Solove in the instant case were of two types. The closure order barred the public, including the media, from attending the trial or inspecting the records of the case. The earlier gag order enjoined the adult parties from discussing the case with others, and thus indirectly restricted public access by depriving the media of a source of news.

### A
### The Closure Order

Because the closure order imposes a greater restriction on public access than the gag order, see *Richmond Newspapers, supra,* at 581, we discuss it first. At the outset, we dispose of two subsidiary issues.

First, Juv. R. 37(B) prohibits public use of juvenile court records by any person except for purposes of appeal or with leave of court. That portion of the closure order pertaining to the case records does nothing more than restate the restriction found in Juv. R. 37(B). The validity of this rule has not been challenged, either here or in the courts below.

Second, the Dispatch and its supporting *amici* contend that a prior restraint bears a "heavy presumption" against its constitutional validity, as held in *Organization for a Better Austin* v. *Keefe* (1971), 402 U.S. 415, 419. The closure order, however, is not a prior restraint. A prior restraint occurs when the state attempts to prohibit the broadcasting or publication of material already in the possession of the media. *Florida Freedom Newspapers, Inc.* v. *McCrary* (Fla. 1988), 520 So. 2d 32, 35. The closure order does not prohibit anyone from publishing information already obtained.[10] It acts only to keep the Dispatch from being present at a place and time where it would be able to gather more information. A restriction on the ability to gather news is not a prior restraint.

Passing these preliminary points, we address the merits of the closure order. Jamie Schmerbeck, a social worker who had direct contact with Tessa, testified that media coverage of the court proceedings would not be in Tessa's best interest. Schmerbeck asserted that continued publicity would increase the chance that Tessa could be exposed to "negative allegations" concerning Reams's or Seymour's fitness as a parent. "She [Tessa] believes that both of those parties are her parents, and it doesn't take an expert to say that children are protective of their parents and that they love their parents. It would be very confusing to her to hear any negative testimony in the sense of her parents." Schmerbeck conceded that some harm might already have occurred as a result of previous press coverage, or might occur even if there were no press coverage, but concluded that

---

[10] The original motion for closure included a provision asking the court to establish "limitations on * * * the use of the minor's name and physical description and other information regarding the child." Counsel for the Dispatch pointed out that this appeared to be an attempt to impose restrictions on the use of information already in the possession of the media. After counsel for Tessa disclaimed any attempt to impose a prior restraint, the court and counsel agreed to proceed with the understanding that no prior restraint would be sought or imposed.

"the more exposure there is, * * * the greater the possibility of harm * * *."

The Dispatch attacks this testimony on two fronts. It first argues that Schmerbeck's testimony is insufficient to establish a substantial probability of harm to Tessa. While this may be true, we have held, *supra,* that the evidence need only show that there exists a reasonable and substantial basis for believing that public access could harm Tessa. Based on the unrebutted testimony of Schmerbeck, an expert who has had direct contact with Tessa, we conclude that a sufficient showing has been made.[11]

The Dispatch also contends that even if publicity would harm Tessa, the media coverage which preceded the closure and gag orders was so pervasive that it is too late for the court to protect her. The Supreme Court of Vermont rejected a similar argument in a case involving a juvenile accused of a highly publicized rape-murder, the details of which — including the child's name — had been "flagrantly publicized" before his delinquency hearing. We find merit in the Vermont court's observations that this argument would let "the news media determine which juvenile proceedings will be open to the public by turning up the volume of publicity concerning any case which strikes their fancy. * * * [D]ecisions to open proceedings will then be based, not on the child's needs, but on chance circumstances. * * *" *In re J.S., supra,* at 1130; see, also, *State in the Interest of D.B., supra,* at 592, 439 A. 2d at 98.

We are also persuaded by the argument of Tessa's counsel that the presence of the media would place him and the guardian ad litem in "an untenable position" when deciding what evidence to present. They would be forced to weigh the psychological harm to Tessa posed by the disclosure of evidence against the value of evidence needed to support her case. For example, there are psychological evaluations of Tessa and the adult parties who seek custody of her. These reports will constitute an important part of the evidence to be presented at trial. Public disclosure of these evaluations has the potential of harming Tessa. The Dispatch contends that Judge Solove need not close the entire trial to accommodate these concerns, but no proposal for a workable "less restrictive" alternative has been demonstrated.

Further, we can see that concern for the effect on Tessa would burden a lawyer's conscience as he questions the witnesses. A lawyer should be free of such extraneous conflicts of interest. This is especially so in this case, where one of the parties has announced an intent to try her case in the media. When the guardian must make strategic trial decisions based upon the potential psychological harm to his ward caused by the presence of the public, the fairness of the adjudication is endangered.

Balanced against the interest of Tessa, there are arguments in favor of a public trial. The opportunity is presented to study the potential pitfalls of surrogacy contracts. Discussion of the case might help resolve the question of whether to enforce such contracts. The public would be educated in

---

[11] The testimony of Dr. King at the gag order hearing would also tend to support this conclusion; however, Judge Solove denied a motion by Reams's counsel to supplement the record of the closure order hearing with the transcript of Dr. King's testimony. This testimony cannot, therefore, be considered part of the record for purposes of evaluating the closure order.

the decision-making processes of the juvenile court. Since Judge Solove is an elected official, the public has a right to observe and evaluate his performance in office. Finally, the media have a legitimate interest in reporting the details of a newsworthy and emotionally charged story. These interests are entitled to weight in the balancing process.

Closure decisions are to be made by the trial judge on the totality of the circumstances. That decision should withstand review unless the trial judge has abused his or her discretion in applying the standard we have set. Balancing the possibility of psychological harm to Tessa and the threat to a full exploration of the relevant evidence posed by a media-exploited public trial of Tessa's tragic situation against the public access interests, we conclude Judge Solove did not abuse his discretion in ordering a closure. Accordingly, we reverse that portion of the court of appeals' judgment which prohibits Judge Solove from enforcing the closure order.

## B

### The Gag Order

The gag order enjoins the adult parties and their counsel from communicating any information about Tessa or the custody litigation. While this order does not impose a prior restraint on the *press*, see, *e.g., Central Carolina Chapter, Society of Professional Journalists* v. *Martin* (D.S.C. 1977), 431 F. Supp. 1182, affirmed as modified (C.A. 4, 1977), 556 F. 2d 706, certiorari denied (1978), 434 U.S. 1022, it does limit the *parties'* freedom to disseminate information already in their possession. However, "[t]he phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test. * * *" *Kingsley Books, Inc.* v. *Brown* (1957), 354 U.S. 436,

441. Gag orders are considered a less restrictive alternative to restrictions imposed directly on the media. See *Nebraska Press Assn.* v. *Stuart* (1976), 427 U.S. 539, 564. In the presumptively *open* atmosphere of the adult criminal or civil trial, orders which are effectively prior restraints on the litigants have been frequently used to protect the criminal defendant's right to a fair trial, *e.g., Nebraska Press, supra,* at 564; *Sheppard* v. *Maxwell* (1966), 384 U.S. 333, 361; *Florida Freedom Newspapers, Inc.* v. *McCrary* (Fla. App. 1986), 497 So. 2d 652, 657, affirmed (Fla. 1988), 520 So. 2d 32, and to secure a litigant's confidentiality interest in information subject to civil discovery, *e.g., Seattle Times Co.* v. *Rhinehart* (1984), 467 U.S. 20 (protective order prohibiting defendant newspaper from publishing confidential material obtained from plaintiff in libel action); *Triangle Ink & Color Co., Inc.* v. *Sherwin-Williams Co.* (N.D. Ill. 1974), 61 F.R.D. 634 (protection of trade secrets), and the privacy interests of parties to sensational cases, *e.g., S.N.E.* v. *R.L.B.* (Alaska 1985), 699 P. 2d 875 (child custody case involving lesbian mother; order found to be overbroad); *Mason* v. *Reiter* (Fla. App. 1988), 531 So. 2d 348 (paternity action involving famous comedian; contempt citation for violation of gag order technically defective). We conclude that a juvenile court, which is not presumptively open, has the power to control extrajudicial comments by the litigants, provided the restrictions are consistent with the standards we have set.

The motion for the gag order was apparently made in response to the media attention aroused by Beverly Seymour's home-made press release. Seymour has stated that her objective was to use public opinion to influence the outcome of the case. She feels she

is at a disadvantage in this litigation, representing herself *pro se* and "lacking money, power, [and] position[.]" She considers media attention "her only trump card * * *." In Seymour's view, publicity favorable to her cause would benefit Tessa: "She is never going to be harmed or have a hair on her head affected if millions of people are looking out for her best interests, as is her mother."

Norma Stotski testified that she, too, was scheduled to appear on "Geraldo." Stotski felt compelled to respond to Seymour in the press "to protect myself and my own image," though she would have preferred to avoid publicity. Richard Reams did not testify, but his counsel said that Seymour's statements to the press had placed him in a difficult position. Counsel stated that Reams believed "it would be in the child's best interests to refrain from comments to any media," but found it difficult to refrain from responding to "Ms. Seymour's attempt to get public opinion on her side."

Dr. Jo Ann King, a clinical psychologist, testified that a child who is the subject of a custody dispute is already in a difficult position and faces a "[h]igh probability" of emotional harm. She stated that the effect varies with age and maturity, and tends to be worse with younger children. In Dr. King's opinion, substantial publicity about the custody dispute would heighten the probability of harm. Dr. King explained that this is because "[a] young child has a tendency to see the world normally from an egocentric point of view, which means that a young child takes responsibility for things that are going on around them much beyond what they have control of

or input to; so that when they are surrounded with intense interest being focused on their being, they can't sort that out, but take responsibility for it." She concluded that substantial publicity is contrary to the best interests of a child involved in a custody dispute.

The evidence establishes that Seymour was engaged in a campaign to intensify media coverage of the custody dispute. Given the unrebutted expert testimony of Dr. King that intensive coverage of custody disputes is detrimental to children, and the sensationalist tone of some of the reporting, there is a reasonable and substantial basis for believing that public access could psychologically harm Tessa.

The evidence also establishes a reasonable and substantial basis for believing that Seymour's media campaign could endanger the fairness of the adjudication. "The very purpose of a court system is to adjudicate controversies * * * in the calmness and solemnity of the courtroom according to legal procedures. * * *" *Cox* v. *Louisiana* (1965), 379 U.S. 559, 583 (Black, J., concurring in part and dissenting in part). "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper. * * *" *Bridges* v. *California* (1941), 314 U.S. 252, 271.

We find nothing in the record to suggest that Judge Solove would be swayed by Seymour's efforts to marshal public opinion. However, the parties have been placed in the position where they must choose between defending themselves in the media (thereby increasing the possibility of harm to Tessa) or risking damage to personal reputations and to the rights of the litigants.[12]

---

[12] While we have criticized Seymour's media campaign and believe that it is not in Tessa's best interests, we express no opinion on the sincerity of Seymour's motives.

We caution the parties, and the courts which will decide Tessa's fate, that we intend no adverse comment on Seymour's fitness as a parent.

These interests must again be balanced against the public's interest in observing Judge Solove's courtroom and the media's right to gather news. We find that Judge Solove did not abuse his discretion in deciding to impose a gag order.

We agree with appellee, however, that the order itself is overbroad and should be redrawn. Judge Solove enjoined the parties from "disseminating *any* information * * * about the minor child Tessa Reams to *any and all* persons * * * and * * * from otherwise providing *any* information regarding * * * said child either directly or indirectly in any fashion whatsoever." (Emphasis added.) Taken literally, the order prohibits the parties and their counsel from discussing the case with one another. It forbids Reams and Seymour, who are sharing custody of Tessa, from discussing her welfare with each other, Tessa's teacher, or a pediatrician. It prohibits Seymour, a non-lawyer who is litigating the case *pro se,* from hiring counsel or otherwise seeking assistance in presenting her case.

Judge Solove could not have intended to restrict the parties to this extent. We believe he sought only to prevent the parties from "trying the case in the media." Judge Solove can, on the existing record, fashion an order which will preserve the fairness of the legal proceedings involving Tessa without unduly restricting the parties and their counsel. Accordingly, we modify the judgment of the court below to direct it to issue a new gag order consistent with the standards we have set forth.[13]

## IV
## CONCLUSION

In case No. 89-1302, we hold that there is no final appealable order and reverse the judgment of the court of appeals.

In case No. 89-1303, we reverse the judgment granting a writ of prohibition insofar as it prohibits enforcement of the closure order. We modify that part of the writ of prohibition governing the gag order as follows: a limited writ is hereby granted directing the trial court to vacate its orders of February 21, 1989, and issue new orders in their place consistent with the standards contained in our opinion. If no new order is issued within thirty days of the release of this opinion, a writ prohibiting enforcement of the

---

[13] To accomplish such a goal, resort to the Code of Professional Responsibility adopted by this court may be helpful. In formulating DR 7-107 of the Code, thoughtful consideration was given to restrictions against publicity-generating extrajudicial statements.

The Code applies to counsel and not to the parties. However, the provisions of DR 7-107 provide a checklist of relevant considerations where a trial judge has decided to impose a gag order which will apply to non-attorneys.

DR 7-107(G) states:

"A lawyer or law firm associated with a civil action shall not during its investigation or litigation make or participate in making an extrajudicial statement, other than a quotation from or reference to public records, that a reasonable person would expect to be disseminated by means of public communication and that relates to:

"(1) Evidence regarding the occurrence or transaction involved.

"(2) The character, credibility, or criminal record of a party, witness, or prospective witness.

"(3) The performance or results of any examinations or tests or the refusal or failure of a party to submit to such.

"(4) His opinion as to the merits of the claims or defenses of a party, except as required by law or administrative rule.

"(5) Any other matter reasonably likely to interfere with a fair trial of the action."

orders of February 21, 1989 shall issue.

*Judgment reversed in part, affirmed in part, and modified.*

MOYER, C.J., SWEENEY, HOLMES, WRIGHT and RESNICK, JJ., concur.

DOUGLAS, J., concurs in part and dissents in part.

DOUGLAS, J., concurring in part and dissenting in part. I concur in paragraph one of the syllabus of the majority and the discussion supporting paragraph one as found in Part I of the majority opinion. However, because I believe that it is our responsibility to apply the law to each citizen in each case and arrive at an appropriate decision, and, because I believe the majority has not done so in this case, I must vigorously, but respectfully, dissent.

It is my judgment that today this court commences a dangerous journey down a murky road when it sanctions the closing of courtrooms in Ohio and the issuing and enforcing of gag orders. While my distaste, given the applicable constitutional provisions, as I interpret them, for *any* courtroom closure or gag order continues unabated, I am particularly alarmed by the majority's assertion that it has "followed" *Press-Enterprise Co.* v. *Superior Court* (1986), 478 U.S. 1, and has "explained" *State, ex rel. The Repository*, v. *Unger* (1986), 28 Ohio St. 3d 418, 28 OBR 472, 504 N.E. 2d 37. My guess is that those persons involved in those cases would not recognize what today the majority says the cases stand for.

It is my view that those cases have interpreted the First Amendment to the United States Constitution (*Press-Enterprise*) and Section 16, Article I of the Ohio Constitution (*Unger*). They stand for principles that have been well-established and recognized, to wit: that any party seeking to close a courtroom (or secure a gag order) must, as an initial step, demonstrate a "substantial *probability*" that a "higher value" will suffer prejudice "by publicity that closure would prevent." Further, the cases stand for the proposition that there must also be a showing that there are no reasonable alternatives to closure that can adequately protect the higher value.

A *unanimous* court of appeals found these principles to be in full force and effect and further found that the extensive closure and gag orders of the trial court did not meet the applicable standards. The judgment of the court of appeals should be affirmed and the writ of prohibition should issue.

A majority of this court has, in the past, made salutary advances in protecting First Amendment freedoms and has taken a steadfast course of ensuring that the public has access to government records and that meetings of public bodies be open to the public. As such, I once believed that this court would be recognized for our achievements in these areas for some time to come. However, rather than continuing to take strides forward in protecting these precious rights, this court has recently taken significant steps backward in these areas by eroding First Amendment freedoms and the public's right to know. See, *e.g., State, ex rel. Polovischak*, v. *Mayfield* (1990), 50 Ohio St. 3d 51, 552 N.E. 2d 635; *Tasin* v. *SIFCO Industries, Inc.* (1990), 50 Ohio St. 3d 102, 553 N.E. 2d 257; *State, ex rel. Hastings Mut. Ins. Co.*, v. *Merillat* (1990), 50 Ohio St. 3d 152, 553 N.E. 2d 646; *State, ex rel. McGee*, v. *Ohio State Bd. of Psychology* (1990), 49 Ohio St. 3d

59, 550 N.E. 2d 945; and *State, ex rel. Scanlon,* v. *Deters* (1989), 45 Ohio St. 3d 376, 544 N.E. 2d 680. See, also, *State, ex rel. Mazarro,* v. *Ferguson* (1990), 49 Ohio St. 3d 37, 550 N.E. 2d 464. By today's decision, those seemingly modest backward steps have matured into a giant step backward in the never-ending battle to assure that the rights of all people guaranteed by the First Amendment to the Constitution of the United States and Sections 11 and 16, Article I of the Ohio Constitution are preserved.

In upholding the constitutionality of the closure order, the majority sanctions restrictions on the liberty of the press by restricting the rights of the public (including the press) to attend trials. Further, by directing Judge Solove to issue a new gag order, the majority sanctions restrictions on the liberty of speech, and of the press.

Section 16, Article I of the Ohio Constitution provides in relevant part:

"*All courts shall be open, and* every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." (Emphasis added.)

The comma which follows the word "open" clearly demonstrates that Section 16, Article I requires all courts to be open to everyone regardless of whether or not the person seeking access to the courts has been injured. By interpreting Section 16, Article I differently, the majority has obviously chosen to ignore its clear and unambiguous language. In my judgment, Section 16, Article I is an absolute command that all courts are to be open in all circumstances and to all people (including the press).

The majority says that interpreting Section 16, Article I to mean what it says is "simplistic." I agree!

"Simplistic" is defined as: "* * * of, relating to, or characterized by simplism * * *," and "simplism" is defined as: "* * * the tendency to concentrate on a single aspect (as of a problem) to the exclusion of all complicating factors * * *[.]" Webster's Third New International Dictionary (1986) 2122. The language and intent of Section 16, Article I is clear and there is nothing complicated about it. In Ohio, the courts must remain open. On one point, the majority is correct. The original open courts provision (Section 7, Article VIII, Constitution of 1802) was enacted without amendment or discussion. Likewise, the provision was not debated or changed at the 1850-1851 convention where it was placed into the current Bill of Rights. Further, at neither the 1873-1874 nor the 1912 convention were the original words of the drafters altered. I suggest that there was nothing about the open courts provision to discuss because the provision means exactly what it says. Section 16, Article I is a simplistic provision of our Constitution (concentrating on one problem — the tendency to close courthouse doors) and it is entitled to a simplistic interpretation.

Section 11, Article I of the Ohio Constitution provides in relevant part:

"*Every citizen may freely speak,* write, *and publish his sentiments* on all subjects, being responsible for the abuse of the right; *and no law shall be passed to restrain or abridge the liberty of speech, or of the press. * * *"* (Emphasis added.)

It is difficult to imagine anything more clear than the language of Section 11, Article I (except, perhaps, the language of Section 16, Article I).

In my judgment, the closure order issued by Judge Solove is violative of Section 16, Article I and Section 11, Article I of the Ohio Constitution. Not

only does the order abrogate the public's right to access the courtroom, but also effectively takes away the media's ability to gather the news. Thus, it can hardly be said that the closure order does not restrain or *abridge* the liberty of the press.

Similarly, the gag order issued by Judge Solove abridges the rights of consenting adults to speak freely to one another (as in *Tasin, supra*) and not only seals the lips of the parties and their lawyers, but effectively seals the lips of the media by taking away its ability to gather the news. As such, the gag order restrains and abridges the liberty of speech, and of the press, in violation of Section 11, Article I. While I agree with the majority that the gag order is overbroad, I do not agree that Judge Solove should be directed to issue another order which, in my judgment, will just as certainly restrict the liberties guaranteed by Section 11, Article I as does the gag order presently before us.

In promulgating its "guidelines," the majority sanctions the sealing of the records in the case at bar for today (and every avenue of public access to any information concerning the proceedings in this case) and, in doing so, the majority has indicated a willingness to *forever* prohibit all information regarding the proceedings in the case at bar from entering the public realm (see majority opinion, Section II[C]). The next logical step for the majority to take (given today's decision) will be to deny a writ of mandamus sometime in the future which seeks to compel disclosure of the court records in this case. This mandamus action may ensue long after Tessa is beyond the threat of harm that the majority uses to justify today's decision. In addition, what if it is Tessa who seeks to know? Would the majority "protect" her against herself? This is "Big Brother" operating at its best!

Further, in paragraph three of the syllabus, the majority holds that a juvenile court may restrict public access to certain proceedings if the juvenile court finds, *inter alia,* that the potential for harm if the public is allowed access outweighs the benefits of public access. Even if I were to accept such a proposition (which I do not), in my judgment, the benefits of public access outweigh any potential for harm in the case *sub judice.*

The problems associated with surrogate parenting and the custody and dependency actions which may accompany agreements such as the one in the case at bar are of significant public interest. Access to the courts can promote informed public discussion on these matters. Others who are parties (or are considering being parties) to such an agreement should be made aware of the legal and emotional consequences attending certain parenting arrangements. On the other hand, I believe that Tessa can be shielded from those perceived threats associated with allowing the public to access the courtroom and that the case will be decided fairly by Judge Solove regardless of whether the public is allowed access to the proceedings.

Finally, even though there are many other issues and much law on the subject that can be discussed, I confine myself to the majority's argument that not *all* court proceedings are open and, thus, it follows for the majority, that it is proper to close juvenile courts. As an example, the majority cites grand jury proceedings. Again, the majority misses the mark.

I concede that the "open courts" provision does not apply to certain portions or steps of a judicial proceeding. These would include grand jury and petit jury deliberations and even our conferences as we discuss and decide cases. But these steps do not involve actual *trials*. The grand jury in-

vestigates. It does not adjudicate — and there is a world of difference!

Further, appellants argue that adoption proceedings are closed. With regard to adoptions, we have a specific statute, R.C. 3107.17, providing for such hearings to be closed. In contrast, and to me it is a major difference that the drafters of the rule obviously recognized, Juv. R. 27 does not mandate closure but, in fact, presumes that court proceedings will be open to the public. The difference should be obvious.

Concerning the majority's argument that the juvenile courts are somehow different from other courts, I submit that such may be the case but Section 16, Article I of the Ohio Constitution does *not* read, "All courts shall be open — except juvenile courts."

In a concurring opinion in *State, ex rel. Dayton Newspapers*, v. *Phillips* (1976), 46 Ohio St. 2d 457, 471, 75 O.O. 2d 511, 518, 351 N.E. 2d 127, 136, Justice Stern said: "The correction of judicial abuses and the approval of judicial wisdom and integrity depend alike upon the accessibility of the courts to public scrutiny." In a concurring opinion in *E.W. Scripps Co.* v. *Fulton* (1955), 100 Ohio App. 157, 178, 60 O.O. 147, 158, 125 N.E. 2d 896, 909, Judge Hurd said: "* * * Crime and corruption grow and thrive in darkness and secrecy. Justice thrives in the open sunlight of day. If we deny to the public and press access to courts of justice, we foster a system of jurisprudence heretofore unknown in the history of Ohio."

In the case at bar, we have a unique opportunity to reaffirm these principles for Ohio. I regret we have let the opportunity slip by and, in fact, have seriously diminished, once again, the public's constitutional right to know.

I must respectfully dissent.