J.F., APPELLEE, *v.* D.B. ET AL., APPELLANTS.

[Cite as *J.F. v. D.B.*, 116 Ohio St.3d 363, 2007-Ohio-6750.]

*Child custody — Breach of surrogacy contracts — Public policy.*

(No. 2006-0843 — Submitted April 17, 2007 – Decided

December 20, 2007.)

APPEAL from the Court of Appeals for Summit County,

No. 22709, 165 Ohio App.3d 791, 2006-Ohio-1175.

_____

PFEIFER, J.

{¶ 1}  The procedural history of this case includes several court decisions in two states, but the relevant facts can be easily summarized.  Eggs from a nonparty donor were artificially inseminated with semen from appellee, J.F., and implanted in appellant D.B., who subsequently gave birth to triplets. The triplets live with their biological father.  Prior to these events, J.F., D.B., D.B.'s husband, also an appellant, and the egg donor had executed a gestational-surrogacy contract.  The agreement provides that D.B. will "not attempt to form a parent-child relationship with any child conceived pursuant to the contract" and will "institute proceedings" to "terminate [her] parental rights" upon the birth of the children.  In return, J.F. agreed to pay D.B. $20,000 and expenses.

{¶ 2}  A custody dispute followed the birth of the triplets.  In Ohio, J.F. sued D.B. for breach of contract, and both sides moved for summary judgment. In granting summary judgment for D.B. and her husband, the trial court concluded that the provisions of the surrogacy contract that require D.B. to relinquish parental rights and allow J.F. to recoup child-support payments from D.B. if she is awarded custody violate Ohio's public policy and cannot be enforced.  The court of appeals reversed, concluding that nothing in the laws of

Ohio prohibits gestational-surrogacy contracts or enforcing the terms of the contract against D.B. and her husband. We accepted D.B.'s discretionary appeal.

{¶ 3} The sole issue before us is whether the contract entered into by appellants and J.F., in which D.B. agreed to be a gestational surrogate, is contrary to the public policy of Ohio.

{¶ 4} This court has had little occasion to discuss surrogacy contracts. In *In re T.R.* (1990), 52 Ohio St.3d 6, 556 N.E.2d 439, we considered factors in favor of and against a public trial in a case involving a surrogacy contract. One of the factors in favor of a public trial was the opportunity "to study the potential pitfalls of surrogacy contracts." Id. at 20, 556 N.E.2d 439. We also stated that the "problems associated with surrogate parenting and the custody and dependency actions which may accompany agreements such as the one in the case at bar are of significant public interest. Access to the courts can promote informed public discussion on these matters." Id. at 26, 556 N.E.2d 439. These statements are indicative of a lack of a declared public policy for or against surrogacy contracts. Furthermore, as far as we can tell, neither the General Assembly nor any other governmental body in Ohio has ever enunciated a public policy concerning gestational surrogates. See R.C. 3111.89, describing the scope of artificial-insemination provisions, which frankly states, "These sections do not deal * * * with surrogate motherhood." See also Loc.R. 75.1(C)(6) of the Court of Common Pleas of Hamilton County, Probate Division ("All surrogacy adoptions shall be treated as non-relative adoptions") and Loc.R. 83.1(H) of the Court of Common Pleas of Montgomery County, Probate Division ("All surrogate adoptions shall be treated as non-relative adoptions unless the surrogate mother is a relative of the adopting parent or parents").

{¶ 5} A written contract defining the rights and obligations of the parties seems an appropriate way to enter into surrogacy agreement. If the parties understand their contract rights, requiring them to honor the contract they entered

into is manifestly right and just. Even so, the "[l]iberty of contract is not an absolute and unlimited right, but upon the contrary is always subservient to the public welfare." *Pittsburgh*, *Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney* (1916), 95 Ohio St. 64, 115 N.E. 505, paragraph one of the syllabus. Furthermore, "[t]he public welfare is safeguarded, not only by Constitutions, statutes, and judicial decisions, but by sound and substantial public policies underlying all of them." Id. at paragraph two of the syllabus. D.B. cites many statutes and cases to support her position that the public policy of Ohio is undermined by the contract that she and J.F. entered into and, therefore, that that contract is unenforceable. See, e.g., R.C. 5103.17, which prohibits anyone from offering "inducements to parents to part with their offspring," and R.C. 3107.08, 3107.081, 3107.084, and 3107.10, all of which relate to adoption. See also *Doe v. Atty. Gen.* (1992), 194 Mich.App. 432, 487 N.W.2d 484; *In re Baby M.* (1988), 109 N.J. 396, 537 A.2d 1227; *Belsito v. Clark* (1994), 67 Ohio Misc.2d 54, 644 N.E.2d 760.

{¶ 6} Neither these citations nor the many others included in D.B.'s brief and argument convince us that Ohio has a public policy concerning gestational surrogacy. We conclude, therefore, that Ohio does not have an articulated public policy against gestational-surrogacy contracts. Consequently, no public policy is violated when a gestational-surrogacy contract is entered into, even when one of the provisions requires the gestational surrogate not to assert parental rights regarding children she bears that are of another woman's artificially inseminated egg. We affirm the judgment of the court of appeals on this issue.

{¶ 7} Though it is not relevant to this case, we would be remiss to leave unstated the obvious fact that a gestational surrogate, whose pregnancy does not involve her own egg, may have a different legal position from a traditional surrogate, whose pregnancy does involve her own egg. This case does not

involve, and we draw no conclusions about, traditional surrogates and Ohio's public policy concerning them.

{¶ 8} The court of appeals also found that "Mr. and Mrs. [B.] breached the contract," and it assessed some damages and remanded the case for a determination of attorney fees and other expenses. Although the record appears to provide support for the court of appeals' finding, neither we nor the court of appeals should determine breach and damages, because those issues were not briefed at the court of appeals. See *Ins. Co. of N. Am. v. Automatic Sprinkler Corp. of Am.* (1981), 67 Ohio St.2d 91, 98, 21 O.O.3d 58, 423 N.E.2d 151. We therefore reverse the court of appeals' finding of breach of contract and assessment of damages. Accordingly, we affirm in part and reverse in part the judgment and remand the cause to the trial court to determine whether a breach of the agreement occurred and, if so, to determine damages.

Judgment affirmed in part
and reversed in part,
and cause remanded.

MOYER, C.J., and LUNDBERG STRATTON and O'CONNOR, JJ., concur.

O'DONNELL, LANZINGER, and CUPP, JJ., dissent.

_____

**CUPP, J., dissenting.**

{¶ 9} I must respectfully dissent. I believe that the surrogacy contract entered into by the parties in this case is, as a whole, contrary to public policy and void. Consequently, its provisions, including the provisions regarding attorney fees and the surrogate's "services" fee, are unenforceable.

{¶ 10} In the majority's view, the contract is valid because Ohio does not expressly prohibit the practice of gestational surrogacy. But the issue presented encompasses a scope broader than simply whether any Ohio statute specifically and expressly bans gestational surrogacy. The real issue is whether the essential

nature of the contract, drawn from the import of its provisions, runs contrary to the established public policy of this state and, thereby, renders the contract unenforceable.

{¶ 11} It has long been an established principle of law that the freedom of contract is not unlimited and that parties may not enter into a contract that is in violation of established law or public policy. *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Cox* (1896), 55 Ohio St. 497, 515, 45 N.E. 641; *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney* (1916), 95 Ohio St. 64, 68, 115 N.E. 505; *Gugle v. Loeser* (1944), 143 Ohio St. 362, 367, 28 O.O. 318, 55 N.E.2d 580, citing *Twin City Pipe Line Co. v. Harding Glass Co.* (1931), 283 U.S. 353, 356, 51 S.Ct. 476, 75 L.Ed. 1112. See also 17 Ohio Jurisprudence 3d (2001) 428, Section 79; Restatement of the Law 2d, Contracts (1981) 15, Section 179. Further, while we have noted that public policy is difficult to define with accuracy, *Kinney* at 67, 115 N.E. 505, we have acknowledged that it is the cornerstone – the foundation – of all Constitutions, statutes, and judicial decisions. Id. at 69, 115 N.E. 505. Thus, such policy must necessarily govern the proper resolution of this case.

{¶ 12} In reviewing the various public policies attendant to the present case, I conclude that the contract is contrary to public policies safeguarding children. The well-established policy of this state is that on matters of child custody and parental rights, the child is entitled to the protection of judicial oversight. This policy is manifested in numerous statutes and court rules.[1] One specifically applicable to this case is R.C. 5103.17, which prohibits any person

---

1. While many state laws are aimed at protecting children, many of the same provisions afford significant procedural safeguards aimed at protecting the fundamental rights of parents. See generally *Troxel v. Granville* (2000), 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (parents have a fundamental right to the care, custody, and control of their children); *In re C.F*., 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28. Thus, Ohio law provides safeguards to ensure that the rights of both children and parents are adjudicated fairly when those rights are in dispute.

from offering "inducements to parents to part with their offspring." The policy is further evidenced by R.C. 3107.055, which governs the accounting of expenses incurred in adoption proceedings. Because payment for the termination of parental rights is not one of the permitted expenses, it is prohibited. R.C. 3107.055(C). Thus, Ohio law evidences a public policy prohibiting the surrender of parental rights for payment. Although the majority concludes that these statutes do not prohibit the contract at issue in this case, I respectfully disagree.

{¶ 13} The essence of this purported contract is an agreement among unrelated persons for the creation of a child for the payment of money.[2] The contract document requires the surrogate mother and the egg donor[3] to terminate any parental rights they may have to the resulting child, and should they fail to do so, they must return the money paid to them by J.F. to produce the child. Although the contract refers to the payment of money by J.F. to the egg donor and to the surrogate mother for their "services," and not for their consent to adoption of the child or for the termination of any parental rights to the child, it is impossible to so precisely separate the conduct of the parties and the object of the payment of the money. The result of the contractual arrangement violates clearly stated public policy.

{¶ 14} J.F. argues that this provision of the contract is a nullity because the surrogate mother did not contribute any genetic materials to the children and, therefore, would not have any parental rights to assert. However, whether the surrogate mother would be considered a parent under Ohio law is not, in my view, a settled legal issue. See, e.g., R.C. 3111.02(A). Moreover, the egg donor *did* contribute genetic material to the children and, by the same provision of the contract, she is also required to forgo parental rights. For J.F.'s argument in this

---

2. In fact, as the majority opinion notes, three children were born as a result of the transaction.

3. Although the contract refers to J.R. throughout its text as the egg "donor," she was paid $2,500 for the harvesting of her ovum.

regard to be valid, it would be necessary to legally declare that the children do not have a mother. Such a position is untenable.

{¶ 15} It is also the established public policy of this state that a parent must provide for his or her child financially. R.C. 3103.031 imposes a duty on a parent to provide for a child's needs. To that end, R.C. Chapters 3115 through 3127 provide an extensive framework for the enforcement of that obligation. Because this obligation is imposed by law, "[a] father cannot, by contract, escape his responsibility for adequate support of a minor child; and a mother cannot barter away the child's right to such support." *Byrd v. Byrd* (1969), 20 Ohio App.2d 183, 49 O.O.2d 248, 252 N.E.2d 644, paragraph one of the syllabus; See also *Lowman v. Lowman* (1956), 166 Ohio St. 1, 8, 1 O.O.2d 152, 139 N.E.2d 1 (no agreement could affect the obligations of either parent to support the child). In this case, the contract purports to indemnify J.F. for any support obligations that a court may order if custody is awarded to the egg donor or to the surrogate mother. Such a provision is in violation of the expressed public policy and established law of this state.

{¶ 16} To be clear, there is no evidence of improper motive or illicit purpose by any of the parties involved in this matter. It is equally clear, however, that each of the parties to the purported contract is acting out of self-interest, whether for genetic perpetuation or for financial gain. J.F.'s desire to have children of his own origin is clear. The egg donor in this case was paid $2,500 for her role, and the surrogate mother and her husband were paid $20,000 for their contributions. The effect of the majority's holding would permit parties to such a pact to override and to write out the state's traditional oversight role. This oversight role has developed over a long time in response to the experience of society, and it exists to ensure the protection and welfare of children, including children born in consequence of gestational surrogacy arrangements.

{¶ 17} Enforcing this contract, which is no less than a contract for the creation of a child, is likely to open Ohio to being an interstate, and perhaps international, marketplace for gestational surrogacy. Although the genetic father, J.F., is a resident of Ohio, the egg donor is a resident of Texas; the surrogate within whom the fertilized egg was implanted and developed, D.B., is a resident of Pennsylvania; and the organization that brokered the transaction is an Indiana corporation. Without comprehensive rules of engagement for such activity, preferably prescribed by the legislature,[4] it is not difficult to imagine a developing "marketplace" for multiparty, multistate child-production contracts. By 2003, at least six states and the District of Columbia had banned the practice by legislative action. Plant, With a Little Help from My Friends: The Intersection of the Gestational Carrier Surrogacy Agreement, Legislative Inaction, & Med. Advancement (2003), 54 Ala.L.Rev. 639, 650.

{¶ 18} In light of the state's general framework of child-protection laws and careful judicial oversight over such matters, this court should not be an unwitting instrument to opening the door of this state to such unregulated commercial enterprise.

## Conclusion

{¶ 19} I wish to be clear that I do not question the sincerity of J.F.'s desire to have children. The desire to have and to raise children is born of a basic and noble human desire and instinct. While on one hand, as appellee asserts, this case is about recovering the money expended in the arrangement and the attorney fees incurred in its enforcement, on the other hand, this case is not simply about the money. A public policy much more important than money is involved here: the conception and nurturing of children is not just another commercial transaction.

{¶ 20} I would reverse the judgment of the court of appeals.

---

4. See, e.g., R.C. 3111.88 through 3111.97, related to nonspousal artificial insemination.

O'DONNELL and LANZINGER, JJ., concur in the foregoing opinion.

_____

Richard E. Dobbins and Terence E. Scanlon, for appellee.

Hanna, Campbell & Powell, L.L.P., Douglas N. Godshall, and R. Brian Borla; and McCarthy, Martone & Peasley and Joseph P. Martone, for appellants.

_____