J-A01014-17

2017 PA Super 93

| | |
|---|---|
| IN THE INTEREST OF: L.T. AND D.T., MINOR CHILDREN ADJUDICATED DEPENDENT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.Z., NATURAL MOTHER | No. 1032 WDA 2016 |

Appeal from the Order Entered June 6, 2016
In the Court of Common Pleas of Erie County
Civil Division at No(s): 25 and 26 2016

| | |
|---|---|
| IN THE INTEREST OF: L.T. AND D.T., MINOR CHILDREN ADJUDICATED DEPENDENT | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| APPEAL OF: A.Z., NATURAL MOTHER | No. 1035 WDA 2016 |

Appeal from the Order Entered June 16, 2016
In the Court of Common Pleas of Erie County
Civil Division at No(s): 26 2016

BEFORE: BOWES, OLSON AND STRASSBURGER,* JJ.

OPINION BY BOWES, J.: **FILED APRIL 07, 2017**

A.Z. ("Mother") appeals from the respective orders entered on June 6,

2016, wherein the juvenile court changed the permanent placement goals of

---

* Retired Senior Judge assigned to the Superior Court.

her two children, L.T. and D.T., from reunification to adoption.[1]  In addition, Mother appeals the June 16, 2016 order that awarded Erie County Office of Children and Youth Services ("CYS") authority to make all medical determinations, including end of life decisions, relating to D.T.[2]  We reverse the permanency review order relating to L.T., dismiss the appeal from the order relating to D.T.'s end of life decisions, and remand for further proceedings.

L.T. and D.T. were born during October 2014 and September 2015, respectively.  D.T. died on July 15, 2016 as a result of non-accidental traumatic brain injuries sustained during February 2016, while in the care of N.T. ("Father").[3]  Specifically, then-four-month-old D.T. sustained a skull fracture and hematoma on the right side of his brain.  The child presented at UPMC Hamot in Erie, Pennsylvania, unresponsive and in critical condition due

_____

[1] Mother concedes that the goal change order relating to D.T. is moot because that child is now deceased.  **See** Mother's brief at 30 n.10. Accordingly, we address only the portion of the juvenile court order relating to L.T.

[2] While Mother purports to appeal the June 16, 2016 order as to both children, the certified record confirms that the pertinent order related only to D.T. and was entered at 26 of 2016, the action number corresponding to D.T.  The court did not enter a correlating order at L.T.'s action number.

[3] Father was ultimately arrested and charged with criminal homicide, aggravated assault, simple assault, and endangering welfare of children.  As of the date of this opinion, Father remained incarcerated while awaiting trial. He did not appeal either of the orders we address herein.

to elevated intracranial pressure. He was subsequently transferred to Children's Hospital in Pittsburgh. The physicians characterized D.T.'s injuries as near-fatal child abuse.

CYS obtained protective custody of the siblings and filed petitions alleging that L.T. and D.T. were dependent under § 6302 of the Juvenile Act, in that they lacked proper parental care and control. On March 16, 2016, Mother and Father stipulated to the adjudications of dependency for the reasons that CYS stated in its petitions. Significantly, aggravated circumstances were neither alleged in the dependency petitions nor found by the trial court to exist against either parent.[4] The juvenile court awarded CYS legal and physical custody of the children. D.T. remained in a medically induced coma at Children's Hospital of Pittsburgh, where he was expected to remain hospitalized indefinitely. CYS placed L.T. in kinship care with her maternal grandmother ("Grandmother").

The court-ordered permanency goal was reunification, and the juvenile court granted Mother a pair of two-hour supervised visitations with L.T. per week at Grandmother's home. However, Mother, who was recovering from

---

[4] The statutory definition of aggravated circumstances incudes situations where, "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent." 42 Pa.C.S. § 6302. Instantly, a finding of aggravated circumstances against Mother or Father would have effectively alleviated CYS's obligation to employ reasonable efforts to reunify the children with that parent.

an automobile collision that Father intentionally caused, was prohibited from residing in the home with her daughter. Mother was granted visitation with D.T. "as often as she is able to visit" the medical facility. Dispositional Order, 4/8/16, at 3. Although the Commonwealth had not yet leveled criminal charges against Father, the juvenile court suspended Father's visitation with D.T. indefinitely and precluded Father from supervised visitation with L.T. until he demonstrated compliance with the sobriety and parenting components of the court-ordered services. Prior to making any progress toward the visitation prerequisite, Father was arrested in the underlying criminal case and confined to county jail. Given the seriousness of the dependency case, the juvenile court fashioned an abbreviated calendar and scheduled the first permanency review hearing on June 1, 2016, approximately thirty days from the date of the dispositional order.

At the outset of the June 2016 hearing, CYS noted the presence in the court room of an unidentified media outlet and objected to its participation in the closed juvenile proceeding. The respective guardians *ad litem* for both children, Mother, and Father all joined the agency's objection. The juvenile court overruled the collective objections noting that, "given the fact that this case already [garnered] a significant amount of media attention because of [Father's] criminal cases[,]" no compelling state interest existed to close the court room. N.T., 6/1/16, at 4. Accordingly, the juvenile court permitted the media to attend the permanency review hearing. *Id*. at 6.

- 4 -

Next, in addressing the proposed testimony of D.T.'s nurse regarding the child's status, treatment, and prognosis, the trial court noted, *sua sponte*, that it was contemplating changing both children's permanency goals from reunification to adoption. Specifically, the court stated, "The agency is recommending a goal of reunification, but from what I'm looking at in the summary [prepared by the CYS caseworker], I am not sure I'll go along with it. So for all intents and purposes this is a change of goal hearing." **Id**. at 7.

During the hearing, CYS presented the testimony of Patty Bush, the CYS caseworker assigned to the family, and Tina Ferraro, the director of Project First Step, the organization tasked with providing Mother reunification and visitation services. As noted *supra*, D.T.'s nurse testified about his current condition, and Mother testified on her own behalf. Distilled to its essence, the combined testimony from the agency's two witnesses branded Mother as immature, possessing a mentality of entitlement, and dependent upon others for satisfying routine obligations. For example, expecting to be evicted from subsidized housing on the day of the hearing due to the non-payment of utilities, both witnesses stressed that Mother resided in squalor and lacked any concrete plans to obtain suitable housing. In sum, Mother did not demonstrate the urgency that Ms. Bush and Ms. Ferraro believed the situation demanded.

However, the witnesses both testified that, while Mother's current situation remained unacceptable, she had made an effort toward reunification during the brief period that they were involved in the case. Specifically, Ms. Bush stated that Mother started, but had not yet completed, a psychological evaluation and parenting and domestic violence programs. Indeed, CYS's petition for a permanency hearing and the summary that Ms. Bush prepared for the juvenile court in anticipation of that hearing recommended that the agency continue providing Mother reunification services. During the hearing, however, she expanded the recommendation to include "looking for an adoptive resource for [L.T.]" *Id*. at 38.

Similarly, Ms. Ferraro indicated that Mother had not progressed in the one month that she had been in the program. She had various interactions with Mother, including the intake interview and two supervised visitations with L.T. Ms. Ferraro characterized Mother's demeanor as agitated and defensive, and she noted her primary concern that Mother appeared to lack motivation. Nonetheless, Ms. Ferraro did not recommend terminating services at that juncture. To the contrary, she stated, "I will work with her as long as she's willing to work on herself." *Id*. at 72.

At the close of evidence, the juvenile court invited brief argument about the children's permanency goals. It stated, "I'm certainly not leaving the goal of reunification." *Id*. at 101. Mother and Father persisted in arguing that reunification was an appropriate goal in light of the fact that the

family had only been in service for two and one-half months. Similarly, L.T.'s guardian *ad litem* recommended concurrent goals of reunification and adoption because the dependency proceeding was in an early stage. *Id*. at 105 ("Having said that, we are only two and a half months in[.]"). D.T.'s guardian *ad litem* advocated changing the goals to adoption. *Id*. at 105. Likewise, while CYS's pre-hearing filings recommended continuing the goals of reunification, following the hearing, the agency argued to change the goals to adoption. Thereafter, the trial court announced its intention to change the children's permanency goals to adoption. Two days later, the juvenile court entered a permanency review order memorializing the goal change and directing CYS to cease its services to Mother, including visitations, and to pursue the termination of parental rights. Mother filed a timely appeal and a concomitant statement of errors complained of on appeal pursuant to Pa.R.C.P. 1925(b).

Meanwhile, as the dependency matter proceeded toward the permanency hearing that resulted in the goal change, D.T.'s guardian *ad litem*, Stephen George, Esquire, filed and withdrew multiple petitions seeking the juvenile court's guidance concerning D.T.'s end-of-life decisions. Attorney George filed the most recent iteration of his entreaty on June 10, 2016, with the benefit of the medical testimony presented during the permanency hearing. During the ensuing hearing on Attorney George's petition, it was revealed that D.T. was technologically dependent, *i.e.*,

required specialized medical equipment for life support, but he was not in an emergent state that required "heroic efforts . . . to sustain his life."  N.T., 6/16/16, at 5.  Albert Veverka, Esquire, the attorney representing Children's Hospital of Pittsburgh, characterized D.T.'s condition as neither requiring nor precluding a do not resuscitate ("DNR") order.  He summarized the perspective of the supervising physician, Robert Clark, M.D., as follows: "If . . . a mother or father . . .  came . . . and said . . . [`]I want a DNR,['] [Dr. Clark] would say . . . [`]Okay, we can do that.[']"  *Id*. However, "[i]f the same situation arose and the parents . . . said . . . [`]I don't want a DNR at this point, [Dr. Clark] would say . . . [`]Okay, I respect that [too'].  He is of the opinion that[,] at this point in time[,] we're not in that emergent circumstance where a DNR is absolutely necessary or absolutely not necessary."  *Id*.

At the close of the hearing, the juvenile court entered an order confirming that the prior award of legal custody in favor of CYS included the responsibility over "all medical decisions, . . . including end-of-life decisions, in the best interest of the dependent child, [D.T.]."  Trial Court Order, 6/16/16, (unnumbered at 2).  The juvenile court reasserted that Mother was not only prohibited from contacting D.T. directly, but that she also was precluded from contacting Children's Hospital for updates on his condition.  Eventually, the juvenile court relented and permitted Mother one final visitation with her son prior to his death.  Trial Court Order, 7/14/16.

Mother filed a timely appeal from the June 16, 2016 order, which we consolidated with her earlier appeal from the order changing the children's permanency goals to adoption.

Mother presents five issues for our review:

A.    Whether the juvenile court committed an abuse of discretion and/or error of law when it permitted, over unanimous objection, the presence of the media at the permanency review hearing held on June 1, 2016.

B.    Whether the juvenile court committed an abuse of discretion and /or error of law when the agency petitioned for a change of goal and the juvenile court considered the change of goal without providing adequate notice to the parties that a change of goal was to be contemplated at the permanency review hearing held on June 1, 2016.

C.    Whether the juvenile court committed an abuse of discretion and/or error of law when it determined the current permanency goal of reunification was no longer feasible and dispensed with the goal of reunification after only one (1) month and twenty-seven (27) days when the record failed to support a conclusion that it was in the best interest of the minor child to change the goal.

D.    Whether the juvenile court committed an abuse of discretion and/or error of law when it determined that visitation should cease between the appellant and the minor children following the change of goal to adoption when the record failed to support a conclusion that it was in the best interests of the minor children to no longer have visitation with their mother.

E.    Whether the juvenile court committed an abuse of discretion and/or error of law when it denied the appellant the opportunity to participate in the medical decision making for the minor children. In the alternative, whether the juvenile court was manifestly unreasonable when it denied the appellant the opportunity to participate in the medical decision making for the minor children. In the alternative, whether the juvenile court deprived the appellant of her rights under the United States and

Pennsylvania constitutions when it denied her the right to participate in the care and control of her minor children in violation of due process of law.

Mother's brief at 3.

At the outset, we address whether the trial court erred in permitting the media to attend the June 1, 2016 permanency review hearing.[5] We review the juvenile court's decision for an abuse of discretion. *In re M.B.*, 819 A.2d 59, 61 (Pa.Super. 2003) ("When an appeal challenges a trial court's decision to grant or deny access to judicial proceedings, we will reverse only if we find that the trial court abused its discretion.").

Pursuant to 42 Pa.C.S. § 6336(d), except for a declaration of contempt of court or one of the enumerated circumstances that are implicated in delinquency proceedings, "the general public shall be excluded from hearings under this chapter." The provision continues, "Only the parties, their counsel, witnesses, the victim and counsel for the victim, other persons accompanying a party or a victim for his or her assistance, and any other

---

[5] Neither CYS nor D.T.'s guardian *ad litem* addressed this issue. L.T.'s guardian *ad litem* argues unconvincingly that the issue is moot, ostensibly because the consequences of the court's determination on the June 1, 2016 hearing cannot be undone. This argument ignores the continuing nature of dependency proceedings in that permanency review hearings are scheduled at least once every six months until the dependency case is closed. Thus, unless we confront the issue at this juncture, the media will have continued access to L.T.'s dependency proceedings, subject only to the reversal of the juvenile court's attitude. Hence, we address the merits of Mother's argument.

person as the court finds have a proper interest in the proceeding or in the work of the court shall be admitted by the court." *Id*. Hence, it is beyond cavil that the statutory framework promotes confidentiality.

In *In re M.B.*, *supra*, this Court addressed whether the press could access a dependency proceeding. Citing the Juvenile Act approvingly, we found that § 6336(d) "demonstrate[d] our legislature's compelling interest in safeguarding children involved in juvenile proceedings." *Id*. at 62. However, referring to an official comment to § 6336(d) specifying that reporters were within the class of people with a "proper interest" in attending dependency proceedings, we observed that a juvenile court may elect at its discretion to grant the press access. *Id*. at 65. We found a rebuttable constitutional presumption that juvenile court proceedings, like most other judicial proceedings, are open to the public, and concluded that juvenile courts "possess an inherent power to control access to their proceedings and may deny access when appropriate." *Id*. at 60, 62–63. However, we also recognized that the rebuttable presumption of openness is not absolute, and the juvenile courts may still deny access if they find that confidentiality serves an important governmental interest and no less restrictive means exist to serve that interest.

We explained the applicable resolution of the contrasting dynamics between the presumption of openness and the court's inherent power to control access as follows:

In this case, where the constitutional presumption of openness applies and where the trial court has exercised its discretion to close the proceedings, we employ a constitutional analysis [to determine whether the court's decision was an abuse of discretion]. Once an interested party, such as the press, seeks access to such proceedings, the party seeking to keep the proceedings closed may rebut the presumption of openness by demonstrating that: (1) the denial of public access serves an important governmental interest, and (2) no less restrictive means to serve that interest exists. To satisfy these requirements, the party seeking closure must demonstrate that the material is the kind of information that the courts will protect and that there is good cause for the order to issue. A party establishes good cause by showing that opening the proceedings will work a clearly defined and serious injury to the party seeking closure. We have emphasized that only a compelling government interest justifies closure and then only by a means narrowly tailored to serve that interest. Ultimately, the decision whether to grant or deny public access is within the sound discretion of the trial court.

*Id*. at 63–64 (internal citations and quotations omitted). In sum, we concluded that the protection of minors from psychological and emotional harm and the trauma and embarrassment associated with testifying in public were compelling interests that militated in favor of privacy concerns. *Id*. at 64, 65. We also reasoned that, unlike delinquency proceedings, dependent children have not brought attention upon themselves and therefore "the public's interest is less keen than it is in delinquency proceedings." *Id*. at 65 n.5. In addition, this Court observed the informal and non-adversarial nature of dependency hearings and highlighted the chilling effect that publicity associated with open proceedings would have upon the testimony of caseworkers and service providers. *Id*. at 64.

In addressing this issue in its Pa.R.A.P. 1925(a) opinion, the juvenile court concluded that Mother "failed to show a compelling reason why the hearing ought to be closed." Trial Court Opinion, 8/10/16, at 16. The court initially reasoned that Mother did not have standing to challenge the media's presence on behalf of the children, presumably because they had been adjudicated dependent, and that she failed to demonstrate an injury to herself. Thereafter, the court provided an alternative basis to reject Mother's argument on its merits, which was the children's ages.

The juvenile court's rationale demonstrates its misapprehension of the relevant concerns regarding the **children's** interests that we stressed in ***In re M.B.***, ***supra***. First, despite the juvenile court's suggestion to the contrary, Mother was not required to assert that she would suffer harm as a result of opening the proceedings. As we explained *supra*, the focus of the constitutional analysis is the effect of the media's intrusion upon the children. Therefore, any reference to Mother's privacy rights is misplaced. Second, regardless of the dependency adjudication, Mother's parental rights remained intact. Thus, she retained a fundamental interest in the care, custody, and control of L.T. and D.T., including the preservation of privacy concerns and the prevention of psychological and emotional harm flowing from the invasion of their privacy rights. Hence, we reject the juvenile court's conclusion that Mother lacked standing to object to the media's presence at the dependency hearing.

Moreover, we also find unpersuasive the trial court's alternative argument addressing the merits of Mother's complaint. Essentially, the trial court determined, "given the media attention this case received because of the criminal charges filed against the father, and the young age of the children, allowing the press to be present at the review hearing posed little or no danger their privacy interests would be invaded more than had already taken place." Trial Court Opinion, 8/10/16, at 16. Noting the children's respective ages and the fact that D.T. is now deceased, the juvenile court reasoned that the children would not suffer psychological and emotional harm as a result of the media's intrusion. For the following reasons, we disagree with the juvenile court's conclusion that the intrusion would not cause psychological or emotional harm.

Preliminarily, we note that this case is procedurally defective. Typically, in situations involving hearings that are closed to the public by statute, the party seeking access to the closed proceedings files a petition to open the hearing, and upon notice of the petition, the party seeking to keep the record closed is tasked with rebutting the presumption of openness under the two-pronged test we discussed *supra*. **See e.g.**, **In re M.B.**, **supra**; **In re J.B.**, 39 A.3d 421 (Pa.Super 2012). This procedure did not occur in the case at bar.

Presently, the still unidentified media outlet neglected to file a petition announcing its request to open the closed proceeding. It just appeared at

the scheduled permanency review hearing. Then, without prior notice to the parties, the juvenile court acknowledged the media's presence and asked the parties if they wanted to address that issue. Thereafter, the parties uniformly objected to the media's participation, and the court questioned, "How do we know really know that the media is going to invade the privacy of the children. . . [?]" N.T., 6/1/16, at 5. Then, after rebuffing an attempt by the guardian *ad litem* for L.T. to explain the legislatures' interest in enacting the confidentiality component of § 6336(d), the juvenile court invoked its interpretation of **In re M.B.**, and purported to balance the children's privacy rights against the public interest in disclosure and determined, "given the attention the media has already given to this case, [the collective objections do not demonstrate] how the public interest is overridden here." N.T., 6/1/16, at 6. Having found that the public interest prevailed over the children's privacy rights, the juvenile court did not confront whether a less restrictive means existed to protect the children's privacy rights other than the total closure of the dependency proceedings.

The procedural defects in this case are manifest. By failing to require the media to provide a written petition to open the dependency hearing, or even issue notice of its request, the juvenile court denied the parties to the dependency proceeding an opportunity to prepare a measured response that addressed the relevant aspects of the constitutional analysis. The juvenile court's abridged, impromptu discussion regarding the merits of opening the

dependency hearing to the media was insufficient in light of the nuanced evaluation of the countervailing interests that we outlined in ***In re M.B.***, and ultimately proved to be a disservice to the children's privacy interest.

Moreover, we reject the juvenile court's argument that publicizing the dependency proceedings was harmless due to potential dissemination of information during Father's corresponding criminal matter.  At its core, the trial court's reasoning is premised upon the notion that the related criminal case had revealed all of the facts previously hidden.  The logical foundation of that rationale is faulty.  First, the premise ignores the reality that the majority of the information discussed during closed permanency review hearings is wholly irrelevant to the Commonwealth's case against Father or his defense, and therefore, it would not be disclosed in the criminal proceedings.  For instance, pursuant to § 6351(e), permanency review hearings address, *inter alia*, the feasibility and compliance with the permanency plan, the date by which permanency goals might be achieved and whether placement continues to be best suited to the child's safety, protection and physical, mental and moral welfare.  In addition, the juvenile court must also determine the appropriateness and continuing necessity for placement, the appropriateness of the current placement goal, and the date by which the placement goal might be achieved.  In scenarios where the children do not testify, this information is gleaned from the testimony provided by parents, foster parents, caseworkers and service providers.

Father's criminal case, which the juvenile court cited as the main reason for permitting the media's participation in the dependency proceedings, would not reveal these confidential aspects of L.T.'s and D.T.'s lives because they are irrelevant to the criminal matter. As Mother accurately notes, this Court rejected the juvenile court's precise rationale regarding the superseding effect of concomitant open criminal proceedings on a dependent child's privacy rights, and it characterized the assertion as "spurious." *In re M.B.*, *supra* at 64. We explained, "While it is true that the children's names and certain details about their family life have been publicized, we believe . . . that the fact that they have received some publicity enhances their need for privacy now." *Id*. In addition we endorsed the trial court's observation, "the more information that is revealed, the more stress the children experience, the more they are stigmatized, embarrassed, and subject to whispers and speculation." *Id*. at 65 (citation omitted).

Stated plainly, the existence of a related criminal matter is not the dispositive consideration. As noted, few of the highly personal facts that are essential to the permanency review determination in this case would be subject to disclosure during Father's criminal proceedings. Furthermore, the harm stemming from the continued dissemination of this delicate information in open dependency proceedings overrides the public's interest in disclosure. We stressed this latter concept in outlining the parameters of

the two-prong constitutional analysis in ***In re M.B.***, ***supra*** at 64 quoting ***In re T.R.***, 556 N.E.2d 439,451 (Oh. 1990), "Intense publicity surrounding the events which have brought a child into the juvenile court may psychologically harm the child, making it more difficult, if not impossible, for the child to recover from those events."  In addition to highlighting the chilling effect that open dependency hearings would have upon a witness's willingness to speak candidly about the child's best interest, this Court noted that publicity "is inconsistent with the nonadversarial nature of juvenile proceedings."  ***Id***. at 64 (quoting ***San Bernardino County Dep't. of Pub. Social Servs. v. Superior Ct.***, 283 Cal.Rptr. 332 (Cal.App. 1991) ("Private hearings were not intended to simply avoid publicity and its resulting stigma, but were also part and parcel of the informal and nonadversarial nature of juvenile court hearings.")); ***see also T.R.***, 556 N.E.2d at 448–49 (juvenile courts differ from courts of general jurisdiction in that "[h]earings are informal, and based on an inquisitorial model rather than an adversarial one").

For all of the foregoing reasons, we find that the juvenile court abused its discretion in permitting the unidentified media member's access to the closed dependency proceedings without first requiring a formal petition, notice, and the opportunity for the parties to prepare an informed response to satisfy their burden of persuasion regarding both prongs of the constitutional analysis.  Moreover, the juvenile court exaggerated the

significance of Father's criminal trial in reasoning that the public had already garnered much of the confidential information that would be disclosed in the ongoing dependency proceedings. Thus, we direct the juvenile court to close the dependency proceedings consistent with § 6336(d). If, upon subsequent petition, notice, and measured argument beyond the existence of a related criminal matter, the juvenile court finds that the presumption of openness is unrebutted, the court may enter an appropriate order at that juncture.

Next, we address Mother's contention that the trial court erred in changing the children's permanent placement goals from reunification to adoption. The appropriate standard of review of a juvenile court's permanency determination is as follows:

> In cases involving a court's order changing the [court-ordered] goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Therefore, our scope of review is broad.

*In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008) (citations omitted); *see also In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

In *In re A.K.*, 936 A.2d 528, 534 (Pa.Super. 2007), this Court stressed that the focus of dependency proceedings is upon the best interest

of the children and that those considerations supersede all other concerns, "including the conduct and the rights of the parent." Again, in *In the Interest of D.P.*, 972 A.2d 1221, 1227 (Pa.Super. 2009), we explained, "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." *Id*. Likewise, this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." *In re N.C.*, 909 A.2d 818 ,824 (Pa.Super. 2006) (quoting *In re Adoption of M.E.P.,* 825 A.2d 1266, 1276 (Pa.Super. 2003)).

With those principles in mind, we outline the relevant considerations set forth in the Juvenile Act regarding permanency planning:

> Pursuant to § 6351(f)[6] of the Juvenile Act, when considering a petition for a goal change for a dependent child,

_____

[6] During permanency review hearings, trial courts must address the following considerations relevant to the child's well-being.

**(f) Matters to be determined at permanency hearing.—**

At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

*(Footnote Continued Next Page)*

*(Footnote Continued)* _____

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) **The appropriateness and feasibility of the current placement goal for the child**.

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child[.]

. . . .

**(f.1) Additional determination.--**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) **If and when the child will be returned to the child's parent**, guardian or custodian in cases where the

*(Footnote Continued Next Page)*

the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011). Additionally, courts must consider whether reasonable efforts were made to finalize the permanency plan in effect. *See* 42 Pa.C.S. § 6351(f)(5.1).

Mother's first challenge to the goal change order asserts trial court error in failing to provide formal notice that the court was considering

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯⎯

return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) **If and when the child will be placed for adoption**, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

. . . .

**(g) Court order.--**On the basis of the determination made under subsection (f.1), **the court shall order the continuation, modification or termination of placement** or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f)(1)-(6) and (9), (f.1) (1) and (2), (g) (emphases added).

changing the permanency goals to adoption.  Relying upon select segments

of the Pennsylvania Dependency Benchbook ("Dependency Benchbook")[7],

she argues that the juvenile court should have first waited for CYS to file a

petition for goal change and then provide notice to the parties that the

petition would be addressed at the ensuing permanency review hearing.

Mother relies primarily upon the following passage:

"Best Practice – Goal Change Initiation"

> While not required by Pennsylvania statute or rule of court, the request to change a goal can come in many forms. The official change in goal by the court is most commonly initiated by the agency. This is typically done by the agency petitioning the court for a permanency hearing with notice they are requesting a goal change.

> Additionally, nothing precludes the court from initiating a change of goal. In some counties the judge informs all the parties at the Permanency Hearing that a hearing to change the goal will occur at the next scheduled Permanency Hearing. It is particularly beneficial to provide all parties with the date of the upcoming goal change hearing to prevent any issues of parties not receiving appropriate notice.

**See** Pennsylvania Dependency Benchbook 2nd at § 13-3, Office of Children

and Families in the Courts (2014).

---

[7] The Pennsylvania Dependency Benchbook is a compendium on Pennsylvania dependency law that provides an overview of the subject for juvenile court judges to refer to while presiding over a case.  It is not "a substitute for statutory, procedural or other legal authority." **See** Pennsylvania Dependency Benchbook, Office of Children and Families in the Courts, 2010.

Mother asserts that, since neither of the foregoing scenarios outlined in the "Best Practices" notation occurred herein, the juvenile court failed to provide adequate notice that a goal change was contemplated and that it was error to change the children's goals with deficient notice. We disagree.

It is irrelevant that the juvenile court's decision to change the permanency goals did not follow a typical procedural course. As the notation that Mother seeks to invoke states explicitly, there is no statutory requirement that a juvenile court must provide express notice that it is contemplating a goal change. Indeed, while Mother is correct in noting that the Dependency Benchbook refers to goal change hearings, the Juvenile Act does not discuss goal change hearings or mention the phrase "goal change" at all. In **In re R.J.T.**, **supra** at 1183 n.6, our Supreme Court highlighted that the phrase "goal change," is used as a term of art that is synonymous with the juvenile court's mandated determination regarding "the continuation, modification or termination of placement" that a juvenile court **must** render pursuant to 42 Pa.C.S. § 6351 (f), (f.1), and (g) at the conclusion of **every** permanency hearing. **Id**. ("We conclude that an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal.").

Moreover, while Mother concedes that the Juvenile Act authorizes juvenile courts to alter permanency goals *sua sponte*, she focuses on the

Dependency Benchbook's notation that, having initiated the issue, some judges elect to schedule a goal change hearing during the next scheduled permanency review hearing. She reasons that, since the juvenile court did not provide advance notice that it was going to contemplate the goal change at the June 2016 hearing, the court erred in addressing that issue. Mother is mistaken. While it is clear from the foregoing notation that the authors of the Dependency Benchbook recommend that trial courts issue prior notice of a goal change, the statute forewarns the parties that the issue will be addressed as a matter of course during **every** permanency review hearing.

Regardless of the Dependency Benchbook's observation concerning the scheduling preferences of "some" judges, the Juvenile Act remains the dispositive authority in dependency cases. As we discussed, *supra*, § 6351 of the Juvenile Act directs that a juvenile court not only consider the appropriateness and feasibility of a child's current goal during the permanency review hearings, it also mandates that the court enter an order addressing whether to continue, modify or terminate placement. **See** 42 Pa.C.S. § 6351 (f)(4), (f.1), and (g). Hence, despite Mother's complaint that she was not provided notice that a goal change would be at issue during the June 2016 permanency review hearing, a review of the current goal's feasibility is a required component of **every** permanency review hearing. The certified record confirms that the juvenile court issued Mother formal

notice of the June 1, 2016 permanency review hearing. Accordingly, her challenge fails.

Having found no error regarding notice, we address the merits of Mother's assertion that the trial court erred in changing L.T.'s permanency goal from reunification to adoption after only approximately two months of services. She contends that the decision to change L.T.'s permanency goals ran contrary to the Juvenile Act's foremost purpose "to preserve the unity of the family whenever possible [.]" 42 Pa.C.S.§ 6301(b)(1). Similarly, citing the statutory requirement pursuant to §6351(f)(9), that an agency typically must request a goal change when a child has been in care for fifteen to twenty-two months, Mother contends that the act "contemplate[s] remedies . . . that extend fifteen (15) to twenty-two (22) months." Mother's brief at 38. Thus, she argues the juvenile court's decision to change her daughter's permanency goal was procedurally premature.

Similarly, invoking the Dependency Benchbook's discussion concerning early stages of dependency, Mother asserts that the juvenile court should have utilized the June 2016 permanency review hearing to consider her initial progress and to make minor adjustments to the permanency plan. In addition, highlighting the May 19, 2016 court summary that Ms. Bush prepared and CYS submitted in anticipation of the permanency hearing, Mother observed that she was compliant with the plan and had initiated the recommended services. Furthermore, the agency recommended the

continuation of her reunification efforts. Hence, she concludes the juvenile court's decision to change L.T.'s permanency goal to adoption after only two months was hasty. For the reasons that follow, we reverse the juvenile court order changing the goal from reunification to adoption.

In addressing these issues, the juvenile court first correctly highlighted that Mother's reliance upon the fifteen-to-twenty-two-month period is misplaced in that the Juvenile Act does not prohibit it from altering a child's permanency goal at any time that the court determines that reunification is no longer viable and that another more appropriate goal exists. Next, the court attempted to bolster its position by citing to **In re D.P.**, **supra** and **In re M.S.**, 980 A.2d 612 (Pa.Super. 2009), two cases where this Court affirmed juvenile court goal change orders at the dispositional phase.

First, we agree with the trial court's characterization of the Juvenile Act's timing requirements. It is beyond cavil that the fifteen-to-twenty-month period outlined in § 6351 is not a prerequisite to a goal change, but rather, an aspirational target in which to attain permanency. **See** 42 Pa.C.S. § 6351(f.1)(9) ("If the child has been in placement for at least 15 of the last 22 months . . . [the court must determine] whether the county agency has filed or sought to join a petition to terminate parental rights[.]"). Thus, Mother's citation to that provision for the proposition that she was entitled to the full extent of the fifteen-to-twenty-two month term is unpersuasive.

Nevertheless, the juvenile court's reliance upon *In re D.P.* and *In re M.S.* is plainly misplaced. *In re D.P.* involved an extensive procedural history spanning ten years between the agency's initial involvement with the family and the goal change order. Also, unlike the case at bar, the facts underlying our review of *In re D.P.* included a prior adjudication of dependency and reunification as well as an express finding of aggravated circumstances against one of the parents. In addition, the agency was actively involved with the family for approximately three years between the pertinent adjudication of dependency during September 2005 and the July 2008 dispositional order granting the goal change.

Our holding in *In re M.S.*, *supra*, may appear to support the juvenile court's positon insofar as we affirmed a juvenile court's order establishing adoption as the initial permanency goal. However, upon closer inspection, the perceived support is ephemeral. Like the facts underlying our review of *In re D.P.*, *supra*, the pertinent aspects of *In re M.S.*, *supra*, included "a longstanding relationship. . . going back approximately 12 years" as well as the trial court's implicit finding that Mother's failure to protect the child from repeated sexual assaults "by at least one but in all likelihood more than one of her brothers" constituted aggravated circumstances that warranted setting adoption as the initial permanency goal for the 12-year-old child. *Id*. at 613, 614-615.

More importantly, unlike the case at bar, our review of the certified record in *In re M.S.* supported the juvenile court's finding. We explained that the mother's "apathy and indolence in taking corrective measures [were] the root problems of [that] case, [and that her inaction] smack[ed] squarely in the face of achieving M.S.'s best interests." *Id*. at 618. Indeed, our citation to the *In re D.P.* Court's reasoning in *In re M.S.* provides a conspicuous illustration of why the juvenile court's reliance upon those cases is misplaced herein. In affirming the court's purportedly abrupt invocation of adoption in *In re M.S.*, this Court recounted approvingly, "It is not reasonable to suggest that after many fruitless years of providing services to Mother that the Agency should be expected to continue providing the same services over and over again." *Id*. *quoting* *In re D.P.*, *supra* at 1231. Instantly, however, as we explain, *infra*, the facts do not demonstrate the futility of CYS's reunification efforts, and more importantly, it does not reveal a prolonged exhaustion of reunification resources. To the contrary, CYS provided Mother services for no more than three months. Thus, neither of these cases supports the legal principle for which they were cited, *i.e.*, that this Court routinely affirms goal change order following truncated reunification efforts.

As indicated in the preceding discussion, our review of the record sustains neither the juvenile court's finding that "[r]eunification is not a viable option in this case" nor its determination that "the safety and

wellbeing of L.T. is seriously threatened by Appellant's inability to take responsibility for herself, her failure to address problems with domestic violence, her homelessness and deplorable home conditions when she did have housing." Trial Court Opinion, 8/10/16, at 21.

In rendering its decision, the trial court focused primarily on the brutality of D.T.'s severe physical injuries, Mother's belief that Father was not capable of inflicting the savage beating upon their infant son, and the immaturity and perceived lack of urgency that twenty-one-year-old Mother revealed during the hearing. The trial court discounted Mother's compliance with the agency's plan and the progress that she achieved during the short-lived period that she received reunification services. More importantly, the juvenile court disregarded the undisputed evidence that L.T. thrived during the brief period that she was placed in Grandmother's kinship care, that Mother and L.T. shared a close bond, and that it was in the child's best interest to continue reunification efforts.

The record bears out Mother's compliance in light of the circumstances that she faced in this case. Recall that Mother was required to: 1) participate in a psychological evaluation to determine any mental health deficiencies and follow treatment recommendations; 2) complete an approved parenting program; 3) attend medical appointments; 4) attend visitations regularly and demonstrate appropriate parenting; 5) complete a

domestic violence program; 6) maintain safe and stable housing; and 7) execute necessary releases.

Unfortunately for Mother, she struggled to maintain safe and stable housing. The record confirms that Mother has lived in squalor for the duration of the agency's involvement with the family and that she anticipated being evicted from her subsidized residence on the date of thepermanency review hearing. On the verge of homelessness, Mother still rebuffed Ms. Ferraro's attempts to register her into a temporary shelter, apparently because she did not want to be confined to the city of Erie without access to transportation. Mother informed both caseworkers that she intended to reside with a neighbor temporarily until she and her new boyfriend could obtain a residence together. Along with the severity of D.T.'s injuries and its interpretation of Mother's poor attitude, Mother's housing predicament was among the juvenile court's primary motivations for the goal change.

While the certified record plainly supports the juvenile court's finding that Mother failed to satisfy the housing requirement, the court's rationale discounted Mother's physical limitations due to injuries stemming from a recent automobile collision. Ms. Bush testified during the hearing that Mother suffered extensive injuries, some of which required surgery, to her collar bone, ribs, and shoulder from the car accident. *Id*. at 44. The injuries limited the use of one arm and affected her ability to clean her home

without assistance. *Id*. In fact, Ms. Bush testified that Mother had complained that she could barely care for herself with the use of only one arm. *Id*. Rather than appreciate the reality of Mother's physical impairment, the juvenile court twice chastised Mother for blaming Grandmother's inability to help her with housekeeping for the condition of the home. Trial Court Opinion, 8/10/16, at 8. Likewise, while Mother's makeshift housing arrangement was inadequate and her plan for stable housing was still uncertain, those deficiencies did not demonstrate Mother's long-term inability to reunite with L.T. Thus, although the record supports this aspect of the juvenile court's finding, under the circumstances of this case, we do not believe that Mother's housing predicament is a basis to change the dependency goal from reunification to adoption.

With regard to the remaining objectives, Mother made moderate progress during the two months that she received services. She executed the necessary releases and regularly attended supervised visitations with L.T. N.T., 6/1/16, at 40. Mother demonstrated appropriate parenting behavior, and even though L.T. recognized Grandmother as the primary caretaker, Mother's bond with her daughter was evident. *Id*. at 41, 53-54, 65. Hence, those aspects of the plan were satisfied.

In addition to satisfying the visitation and clerical components of the goals that we documented above, Mother completed the initial portion of her psychological evaluation on May 10, 2016. However, as Ms. Bush explained

during the evidentiary hearing, Mother could not attend the scheduled follow-up session scheduled for May 19, 2016, because she had been subpoenaed as a witness at Father's preliminary hearing on that date. N.T., 6/1/16, at 34, 45. The appointment was rescheduled for June 6, 2016, approximately one week after the permanency review hearing. *Id*. at 34. Thus, she was compliant with this aspect of services.

Likewise, Mother was compliant with the domestic violence component. Ms. Bush indicated that Mother enrolled in a twenty-four week domestic violence program and attended the first three classes. *Id*. at 35; CYS Case Summary, 5/19/16, at 8. Further, Ms. Bush testified that Mother advised her that she recognized that her relationship with Father was toxic and that she terminated it. N.T., 6/1/16, at 32.

Mother also satisfied her obligation to enroll in a parenting education program. She began Project First Step on May 5, 2016. While Mother's personality initially clashed with the assigned caseworker, Ms. Ferraro, who found mother defensive, agitated and resistant to independence, she had completed approximately one month in the program prior to the hearing. Significantly, although Ms. Ferraro stressed Mother's deficiencies, she did not recommend terminating services and stated that she was committed to work with Mother as long as she stayed committed to the program. *Id*. at 72.

In sum, notwithstanding Mother's well-documented parenting deficiencies, she complied with services during the brief reunification period

and her bond with L.T. was further evidence that continued reunification efforts were in the child's best interest. As the guardian *ad litem* for L.T. opined in her brief in support of Mother's position,

> As Guardian Ad Litem for the minor child, I am not clearly convinced that reunification is not a viable option in this case. Mother had made some progress in the two months between the Dispositional Hearing and the Permanency Hearing, and it is worth noting that during those two months, she herself was injured and she was struggling to cope with a traumatically injured child.
>
> Given the circumstances, I cannot, as Guardian Ad Litem state that changing the goal to adoption is in the child's best interests. That is a determination that will come with time; adequate time to determine whether Mother is genuinely motivated and capable. Two months is simply not enough time to make that determination.

L.T.'s Brief at 13-14.

We agree with the foregoing insofar as the juvenile court's decision to change L.T.'s permanency goal from reunification to adoption after only two months under the facts of this case is tantamount to abuse of discretion. While the juvenile court branded Mother as an immature 21-year old who has yet to exhibit self-reliance or independence, the certified record is more revealing. Mother is no longer romantically involved with Father, and through her domestic violence program, she recognized that the children did not deserve to be victimized by Father's aggression. Likewise, the certified record confirms that Mother maintained a loving relationship with both

children and exhibited appropriate parenting skills during the supervised visitations with D.T. and L.T.

Despite lacking a driver's license she secured transportation from Erie County to Pittsburgh to sit with D.T. regularly while he was in Children's Hospital. Even after Father demolished the family vehicle, Mother persisted, cobbled together resources, and with the assistance of CYS, family, and friends, she continued to make the two-hour trek to Pittsburgh to visit her son. Similarly, as it relates to L.T., the record not only demonstrates that Mother maintained regular visitation, the case workers identified a close bond between Mother and L.T., who has never showed any sign of abuse. Plainly, this is not a case where it is obvious that an uninterested parent is wasting reunification resources while a child languishes in foster care. Mother made some progress during the brief period of reunification, and it is in L.T.'s best interest to grant Mother a legitimate opportunity to demonstrate that reunification is viable. Accordingly, we reverse the order altering L.T.'s permanency goal from reunification to adoption.[8]

Next, Mother assails the juvenile court's decision to terminate her supervised visitations with L.T. She argues that the record does not sustain

_____

[8] At a minimum, the juvenile court should consider concurrent permanency goals that would permit CYS to develop simultaneous reunification and adoption plans.

the trial court's finding that the abrupt cessation of visitation was in her daughter's best interest. Mother asserts that the trial court's rationale in support of its decision ignored the relevant best-interest factors that it was required to consider pursuant to our discussion in *In the Interest of M.B.*, 674 A.2d 702 (Pa.Super. 1996).[9]

Our standard of reviewing a juvenile court's visitation order depends on the child's goal. When reunification is contemplated, a juvenile court cannot deny or reduce visitation absent a "grave threat" to the dependent child. *Id*. at 705 ("As a usual rule, parental visitation is not denied except where a grave threat to the child can be shown"). This standard "underscores the importance of each parent's maintaining a meaningful and sustaining relationship with the child." *Id*. In contrast, when the goal is an alternative to reunification, the juvenile court may limit or deny visitation as long as the reduction satisfies the best interest of the child. This alternative standard recognizes that when reunification is unlikely, the parent-child relationship is no longer paramount. *Id*. We have indicated that "The 'best interests' standard, in this context, is less protective of parents' visitation

---

[9] This Court fashioned the best-interest factors to guide the trial courts in the absence of statutory guidelines concerning parental visitation of dependent children when the the goal is no longer reunification. *See In the Interest of M.B.*, *supra* at 705-706, n.3 ("The Juvenile Act does not contain any guidelines or suggestions for granting or reducing visitation once the child has been adjudicated dependent and removed from his/her natural parents.").

rights than the 'grave threat' standard." **In re L.V.**, 127 A.3d 831 (Pa.Super. 2015) (quoting **In re C.J.**, 729 A.2d 89, 95 (Pa.Super. 1999)).

We explained this dichotomy as follows:

When the child is in foster care, the grave threat standard supports the goal of family reunification as provided in the Juvenile Act. Allowing visitation except in extreme circumstances encourages continued parental interest and contact in order to prepare the child and family for eventual reunification.

However, when the court finds that reunification is no longer the goal, the grave threat standard is not a proper guide, and must be replaced by a standard that recognizes that the natural family is not likely to be a viable entity.

**Id.** at 705-706 (citation omitted).

In light of our finding that the juvenile court erred in altering the permanency goal from reunification to adoption, we do not confront the merits of Mother's assertion that the court was required to address the best-interest factors outlined in **In the Interest of M.B.** Instead, we remand the matter for the juvenile court to address the issue of visitation pursuant to the grave threat standard, *i.e.* whether Mother "demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child." **In re C.B.**, 861 A.2d 287, 294 (Pa.Super. 2004).

Mother's final issue challenges the juvenile court's June 16, 2016 order confirming CYS's authority, as the legal and physical custodian pursuant to § 6357, to make end-of-life decisions in D.T.'s best interest. The appeal from this order was docketed at 1035 WDA 2016. Mother's argument is a

confused presentation of distinct constitutional principles. Initially, Mother asserts that the juvenile court's order infringed upon her parental rights. Mother's brief at 47. While she frames the initial inquiry as requiring strict scrutiny, she failed to provide any legal argument in support of her positon that the denial of her right to participate in the decision making process under the relevant circumstances would not pass constitutional muster. *Id*. Instead, she levels an alternate complaint that the juvenile court violated her due process rights because it failed to conduct an evidentiary hearing prior to confirming the agency's statute-based authority over D.T.'s end-of-life medical decisions. *Id*. at 48.

The guardian *ad litem* for D.T. attempts to counter Mother's elusive constitutional challenges; however, CYS and the trial court both contend that the issue regarding the agency's authority to make end-of-life medical decisions for D.T. is moot because the infant is deceased. The guardian *ad litem* for L.T. declined to address the issue, presumably because she understood that the order did not apply to L.T.

Upon review, we find the appeal docketed at 1035 WDA 2016 is moot. In *In re J.A.*, 107 A.3d 799 (Pa.Super. 2015) we recently reiterated the relevant legal framework as follows:

> As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case,

an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.

*Id*. at 811 *quoting* **In re D.A.**, 801 A.2d 614, 616 (Pa.Super. 2002) (*en banc*).

Presently, the appeal is moot because the only child that was subject to the order is now deceased. Thus, any decision rendered in this appeal would be entirely advisory. Mother and the guardian *ad litem* for D.T. recognize that the appeal is technically moot, but relying upon our discussion in **In re J.A.**, **supra**, they both assert that the appeal is excepted from the mootness doctrine because it raises an issue that is prone to repetition yet likely to evade review. We disagree.

In **In re J.A.**, we confronted a pair of technically moot appeals and found that they were excepted from the mootness doctrine. The first appeal was from a juvenile court order that appointed KidsVoice as the medical guardian of a dependent child. However, after the child's mother filed her notice of appeal, the juvenile court entered a subsequent order terminating the appointment. Hence, as we pointed out in **In re J.A.**, **supra** at 811, "[t]he juvenile court's [latter] order . . . effectively granted the relief requested [in Mother's appeal.]" Thus, it was moot.

Nevertheless, reasoning that the juvenile court could reverse its course and re-appoint KidsVoice as the child's medical guardian, we found the issue capable of repetition. *Id*. at 812. Similarly, noting the fluidity of

the child's best interest throughout the juvenile court proceedings, we determined that the issue of whether the appointment of a medical guardian was in the best interest of the child at any given time was apt to evade review. *Id*.

We employed a similar analysis to the second appeal, which pertained to an order entered before the court reversed itself. During an evidentiary hearing, the juvenile court precluded mother from presenting testimony in support of her desire to regaining medical decision-making rights from KidsVoice. Invoking Pa.R.A.P. 1701, the juvenile court rebuffed the evidence concerning the propriety of the appointment of KidsVoice because the issue was pending on appeal. As noted, the court subsequently withdrew the appointment. In order to evade the mootness doctrine and address the issue regarding the juvenile court's decision to reverse itself on the applicability of Rule 1701, the Court in *In re J.A.* reasoned that the juvenile court's reversals were prone to repetition and that the fact-based determination of the child's ongoing medical needs was likely to evade review. *Id*. at 812.

As noted, both Mother and the guardian *ad litem* for D.T. seek to apply this rationale in order to circumvent the mootness doctrine. The crux of our reasoning in *In re J.A.*, was that best-interest determinations are dependent upon up-to-date facts that are fluid over the course of the dependency proceedings and are therefore necessarily apt to evade review.

*See id* at 812 ("the question of what is in a child's best interest is a fluid concept, potentially changing throughout the life of a dependency case"). This reasoning is misplaced herein.

Unlike the fact-based determinations regarding a child's best interest that we found to be apt to evade review in *In re J.A.*, the issue in the case at bar involves the functional determination of the juvenile court's statutory authority to empower CYS to make end-of-life decisions under 23 Pa.C.S. § 6357. There are no nuanced factual considerations in the case. The issue regarding whether § 6327 authorizes the juvenile court to act in this matter raises a question of law, not L.T.'s best interest. Accordingly, the issue is not inclined to evade review due to any perceived fluidity.

Additionally, we observe that the issue also is not likely to evade review under a typical mootness analysis. Instantly, Mother neglected to file in the juvenile court either a petition to stay the court's June 16, 2016 order pending her appeal or an injunction prohibiting CYS from making a final end-of-life determination for the child. Pointedly, subject to limited circumstances that are not applicable herein, "[a]n order that grants or denies, . . . an injunction" may be appealed as of right. *See* Pa.R.A.P. 311(a)(4).

Similarly, even after filing her notice of appeal, Mother could have, but did not, petition this Court for a writ of supersedeas. Mother even declined to seek any form of stay upon receiving notice of CYS's ultimate decision to

remove D.T. from the ventilator. If granted, these entreaties would have enabled appellate review of the issue while an actual case or controversy still existed. Thus, contrary to the arguments leveled by Mother and the guardian *ad litem* for D.T., this issue is not prone to repetition yet likely to evade review. Indeed, Mother's inaction, rather than some latent difficulty with the appellate process, is the principal reason that the July 16, 2016 order is now moot.

For all of the foregoing reasons, we reverse the juvenile court order appealed at 1032 WDA 2016 that changes L.T.'s placement goals from reunification to adoption and close the dependency proceedings consistent with § 6336(d) and our discussion in **In re M.B.**, **supra**. We dismiss the appeal docketed at 1035 WDA 2016 as moot. Case remanded for proceedings consistent with the opinion. Jurisdiction relinquished.

Judge Olson joins the opinion.

Judge Strassburger files a concurring and dissenting opinion.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/7/2017

- 42 -