J-S72008-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: P.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: P.L.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1009 MDA 2018 |

Appeal from the Order Entered June 18, 2018
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0000041-2016

BEFORE: BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 24, 2019**

P.L.H. ("Mother") appeals from the order dated May 25, 2018, and entered on June 18, 2018, wherein the juvenile court changed the permanent placement goal for her minor daughter, P.H., from reunification to adoption. We affirm.

P.H. was born in October of 2006. She came to the attention of Cumberland County Children and Youth Services ("CYS") on March 1, 2016. At that time, CYS received a report indicating that Mother had been arrested and incarcerated for threatening to shoot an employee of a local business. Mother disclosed that she and P.H. had been living out of Mother's vehicle for the prior two weeks. She refused to provide any information regarding P.H. beyond her first name. Mother also told P.H. to provide no additional information to CYS. Despite Mother's lack of cooperation, CYS located P.H.'s

maternal grandmother, J.H., who indicated that she could not be a placement resource because of her husband's health.

On March 17, 2016, the juvenile court adjudicated P.H. dependent. Thereafter, the juvenile court conducted a series of permanency review hearings. At each permanency review hearing, the juvenile court determined Mother's compliance with her permanency plan to be moderate. However, Mother's visitation with P.H. was initially inconsistent.[1] On May 25, 2018, the court conducted another permanency review hearing. At that time, P.H. had resided in the same foster home since her initial placement in March 2016. The eleven year old informed the juvenile court that she wanted the court to decide whether to return her to Mother's care or move towards adoption. While P.H. expressed a desire to return to Mother, she also recognized that a return to Mother might not be the "best idea," and that she needed finality. Specifically, she responded the juvenile court's inquiry as follows, "I would always go back to my mom first. But if you think that's not the best idea, then I would go with – to adoption." [2] N.T., 5/25/18, at 6. In addition to P.H., CYS

---

[1] Based on Mother's recurring failure to visit with P.H., CYS filed a petition to change P.H.'s permanency goal to adoption in December of 2016. The court denied the petition "to give Mother every opportunity to work towards reunification." Permanency Review Order, Additional Findings, 1/17/17.

[2] Marylou Matas, Esquire was the guardian *ad litem* who represented P.H. during the permanency review hearing. Considering P.H.'s statements in favor of Mother, we recognize the potential for an appearance of a conflict

presented the testimony of Kasey Shienvold, Psy.D., and CYS caseworker Gan

Fry. P.H., through her guardian *ad litem*, presented the testimony of her

foster mother, K.B. Mother did not appear for the hearing. However, she was

represented by counsel.[3] Following the hearing, the juvenile court issued an

---

between Attorney Matas's representation of P.H.'s legal interest and her best interests. In **In re J'K.M.**, 191 A.3d 907 (Pa.Super. 2018), this Court concluded that a trial court erred in rejecting a parent's request for the appointment of a separate guardian *ad litem* to represent her child's legal interest pursuant to 42 Pa.C.S. § 6311(b) and the concomitant rules of juvenile court procedure regarding the powers and duties of a guardian *ad litem*. Additionally, while the parties do not raise this issue, we may address it *sua sponte* because it implicates a child's statutory right to legal representation*. See In re K.J.H.*, 180 A.3d 411, 413 (Pa.Super. 2018); **In re Adoption of T.M.L.M.**, 184 A.3d 585, 590 (Pa. Super. 2018).

However, further proceedings are not warranted herein. Unlike the sixteen-year old child in **J'K.M.**, who effectively demanded to be returned to her mother because she felt betrayed by the juvenile dependency system, P.H.'s positon actually coalesced with the guardian *ad litem's* position insofar as both agreed that reunification with Mother was not the optimal outcome. Stated another way, while P.H. indicated a partiality toward Mother, her preference was for **finality**. Specifically, she testified, "I just want [you] to make a decision. I don't really want to wait any longer. I want it to be adoption or with my mom. I'm tired of waiting. I think it's been like a year or two years or so." N.T., 5/25/18, at 6. In this context, the positions of the child and guardian *ad litem* aligned in a manner that was absent in **J'K.M.** Accordingly, we decline to find that the trial court erred in neglecting to interpret the child's qualified preference for Mother as grounds to appoint separate counsel in this dependency case.

[3] The court appointed Mother several different counsel. The transcript of the May 25, 2018 hearing reflects that Mother typically proceeded *pro se*, with court-appointed counsel assisting her as needed. N.T., 5/25/18, at 30. Attorney Joseph Hitchings represented Mother at the hearing and with respect to this appeal.

order changing P.H.'s permanency goal to adoption. The order also suspended visitation between Mother and P.H.

Mother timely filed a notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and Pa.R.A.P. 1925(b).

On appeal, Mother raises the following questions for our review, which we reordered for ease of disposition:

> 1. Did the [t]rial [c]ourt abuse its discretion and commit an error of law by changing the goal from reunification to adoption when [Mother] was provided no notice that a goal change was being requested or being considered at the scheduled permanency review hearing, and conducting said hearing in [Mother]'s absence, thus violating [Mother]'s Constitutional rights to due process.
>
> 2. Did the [t]rial [c]ourt abuse its discretion and commit an error of law when it found, despite a lack of clear and convincing evidence, that the child's permanent placement goal of reunification with [Mother] was neither appropriate nor feasible, and ordered a goal change to adoption, thus contravening [§] 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f).
>
> 3. Did the [t]rial [c]ourt abuse its discretion and commit an error of law in determining that [Mother]'s compliance with the permanency plan and progress toward alleviating the circumstances which necessitated the original placement was merely "moderate," when the evidence showed [Mother] had met or was meeting all of her reunification plan goals.

Mother's brief at 4-5.

In her first issue, Mother contends that the court erred in *sua sponte* changing P.H.'s permanency goal to adoption without providing Mother notice that the court was considering such a change. Mother's brief at 13-16. Mother

notes that she did not appear for the permanency review hearing and claims that she was not aware that a goal change would be considered. *Id*. at 13. She relies on both the 14th Amendment of the United States Constitution and Pennsylvania Rule of Juvenile Court Procedure 1601 to support her argument that the failure of the court to specifically advise her that it would consider the goal change deprived her of her right to due process.[4] Mother acknowledges that her argument relies upon the language of Rule 1601 as amended effective October 1, 2018, four months after the hearing in question. *Id*. at 13-14. However, she asserts that the new rule represents "best practices" that the trial court should have utilized during the permanency review hearing regardless of its effective date. *Id*. at 15. For the reasons that follow, we disagree.

The juvenile court rejected Mother's argument:

> [Mother] contends that because we "*sua sponte*" changed the goal at the permanency review hearing on May 25, 2018, her right to notice was violated. Section 6351 of the [Juvenile] Act requires us to have permanency review hearings every six (6) months. At each permanency hearing, the court shall determine "[t]he appropriateness and feasibility of the current placement goal for the child." *Id*. at § 6351(f)(4).

_____

[4] Mother's claim relies upon Rule 1601(B), a new subparagraph that provides for notice of a petition for a goal change as follows:

> B. If a party intends to request a goal change from reunification, then either the notice shall state this purpose or the party shall give separate notice of the intended goal change in accordance with paragraph (A).

Pa.R.J.C.P. 1601(B) (effective October 1, 2018).

While an agency typically files a petition to change a goal in a dependency proceeding, there is nothing in the Juvenile Act, case law or rules of procedure prohibiting the [c]ourt from ordering the Agency to change the permanency goal at any time when it is clear that reunification is not viable. Simply stated, there is no statutory requirement that a juvenile court must provide express notice that it is contemplating a goal change. The statute itself provides notice that the juvenile court may modify a goal at any permanency hearing.

Juvenile Court Opinion, 8/27/18, at 7-8.

We discern no error in the juvenile court's analysis. "A question regarding whether a due process violation occurred is a question of law for which the standard of review is *de novo* and the scope of review is plenary." ***Commonwealth v. Tejada***, 161 A.3d 313, 317 (Pa.Super. 2017). "Due process requires that the litigants receive notice of the issues before the court and an opportunity to present their case in relation to those issues." ***Brooks– Gall v. Gall***, 840 A.2d 993, 997 (Pa.Super. 2003) (recognizing that dependency proceedings implicate due process concerns). It is well settled that "procedural due process requires, at its core, adequate notice, opportunity to be heard, and the chance to defend oneself before a fair and impartial tribunal having jurisdiction over the case." ***S.T. v. R.W.***, 192 A.3d 1155, 1161 (Pa.Super. 2018). "The right of a litigant to in-court presentation of evidence is essential to due process; in almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." ***M.O. v. F.W.***, 42 A.3d 1068, 1072 (Pa.Super. 2012).

In ***In Interest of L.T.***, 158 A.3d 1266, 1278 (Pa.Super. 2017), this Court confronted a similar challenge to a juvenile court's *sua sponte* goal change based, in part, upon the best practices espoused in the Dependency Benchbook, and we concluded that the Juvenile Act not only forewarns that the issue of a goal change could be resolved during a permanency review hearing as a matter of course, but it also mandates that the juvenile court decide whether to continue, modify or terminate placement during every permanency review hearing.  We explained,

> It is irrelevant that the juvenile court's decision to change the permanency goals did not follow a typical procedural course. As the notation that Mother seeks to invoke states explicitly, there is no statutory requirement that a juvenile court must provide express notice that it is contemplating a goal change.  Indeed, while Mother is correct in noting that the Dependency Benchbook refers to goal change hearings, the Juvenile Act does not discuss goal change hearings or mention the phrase "goal change" at all. In ***In re R.J.T.***, ***supra*** at 1183 n.6, our Supreme Court highlighted that the phrase "goal change," is used as a term of art that is synonymous with the juvenile court's mandated determination regarding "the continuation, modification or termination of placement" that a juvenile court must render pursuant to 42 Pa.C.S. § 6351(f), (f.1), and (g) at the conclusion of every permanency hearing.  ***Id***.  ("We conclude that an order to continue, modify, or terminate the current placement, as required by the statute, is synonymous with a decision to continue or change the permanency plan goal.").
>
> Moreover, while Mother concedes that the Juvenile Act authorizes juvenile courts to alter permanency goals *sua sponte*, she focuses on the Dependency Benchbook's notation that, having initiated the issue, some judges elect to schedule a goal change hearing during the next scheduled permanency review hearing. She reasons that, since the juvenile court did not provide advance notice that it was going to contemplate the goal change at the June 2016 hearing, the court erred in addressing that issue. Mother is mistaken.  While it is clear from the foregoing notation

that the authors of the Dependency Benchbook recommend that trial courts issue prior notice of a goal change, the statute forewarns the parties that the issue will be addressed as a matter of course during every permanency review hearing.

Regardless of the Dependency Benchbook's observation concerning the scheduling preferences of "some" judges, the Juvenile Act remains the dispositive authority in dependency cases. As we discussed, *supra*, § 6351 of the Juvenile Act directs that a juvenile court not only consider the appropriateness and feasibility of a child's current goal during the permanency review hearings, it also mandates that the court enter an order addressing whether to continue, modify or terminate placement. *See* 42 Pa.C.S. § 6351(f)(4), (f.1), and (g).[5] Hence, despite

_____

[5] As it relates to permanency review hearings, in addition to § 6351(f)(4), which we reproduced *supra*, the Juvenile Act provides as follows:

**(f.1) Additional determination. —** Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:

(1) If and when the child will be returned to the child's parent, guardian or custodian in cases where the return of the child is best suited to the safety, protection and physical, mental and moral welfare of the child.

(2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(3) If and when the child will be placed with a legal custodian in cases where return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.

Mother's complaint that she was not provided notice that a goal change would be at issue during the June 2016 permanency review hearing, a review of the current goal's feasibility is a required component of every permanency review hearing.

*In Interest of L.T.*, *supra* at 1278.

Identical principles apply herein. Mother was served with notice of the permanency review hearing, as well as a copy of CYS's petition for a permanency review hearing. That petition requested that the court determine the appropriateness and feasibility of the current goal. Although CYS did not file a formal petition to change P.H.'s permanency goal to adoption, as we

_____

(4) If and when the child will be placed with a fit and willing relative in cases where return to the child's parent, guardian or custodian, being placed for adoption or being placed with a legal custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

(5) If and when the child will be placed in another living arrangement intended to be permanent in nature which is approved by the court in cases where the county agency has documented a compelling reason that it would not be best suited to the safety, protection and physical, mental and moral welfare of the child to be returned to the child's parent, guardian or custodian, to be placed for adoption, to be placed with a legal custodian or to be placed with a fit and willing relative.

. . . .

**(g) Court order.—** On the basis of the determination made under subsection (f.1), **the court shall order the continuation, modification or termination of placement** or other disposition which is best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1), and (g) (emphasis added).

explained in *In Interest of L.T.*, *supra*, the very nature of the permanency review hearing **required** the juvenile court to determine whether P.H.'s permanency goal was appropriate. *See id*. at 1278 ("a review of the current goal's feasibility is a required component of every permanency review hearing"). Having received notice of the permanency review hearing, Mother was on notice that the court could change P.H.'s permanency goal, including changing her permanency goal to adoption. Accordingly, contrary to Mother's protestations, the juvenile court did not violate Mother's due process rights or the Juvenile Act when it changed P.H.'s permanency goal to adoption.

Next, we address Mother's contention that the juvenile court erred in changing P.H.'s permanent placement goal from reunification to adoption. With regard to our review of a goal change in a dependency case, this Court recently set forth the following:

> In cases involving a court's order changing the [court-ordered] goal . . . to adoption, our standard of review is abuse of discretion. To hold that the trial court abused its discretion, we must determine its judgment was manifestly unreasonable, that the court disregarded the law, or that its action was a result of partiality, prejudice, bias or ill will. While this Court is bound by the facts determined in the trial court, we are not tied to the court's inferences, deductions and conclusions; we have a responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate principles to that record. Therefore, our scope of review is broad.

> *In re S.B.*, 943 A.2d 973, 977 (Pa. Super. 2008) (citations omitted); *see also In re R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010).

- 10 -

In **In re A.K.**, 936 A.2d 528, 534 (Pa. Super. 2007), this Court stressed that the focus of dependency proceedings is upon the best interest of the children and that those considerations supersede all other concerns, "including the conduct and the rights of the parent." Again, in **In the Interest of D.P.**, 2009 PA Super 86, 972 A.2d 1221, 1227 (Pa. Super. 2009), we explained, "In a change of goal proceeding, the best interests of the child, and not the interests of the parent, must guide the trial court, and the parent's rights are secondary." **Id.** Likewise, this Court has held, "a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re N.C.**, 2006 PA Super 285, 909 A.2d 818, 824 (Pa. Super. 2006) (quoting **In re Adoption of M.E.P.**, 2003 PA Super 210, 825 A.2d 1226, 1276 (Pa. Super. 2003)).

With those principles in mind, we outline the relevant considerations set forth in the Juvenile Act regarding permanency planning:

Pursuant to § 6351(f),[6] of the Juvenile Act, when considering a petition for a goal change for a dependent

---

[6] Regarding permanency, § 6351(f), provides:

**(f) Matters to be determined at permanency hearing.—** At each permanency hearing, a court shall determine all of the following:

(1) The continuing necessity for and appropriateness of the placement.

(2) The appropriateness, feasibility and extent of compliance with the permanency plan developed for the child.

(3) The extent of progress made toward alleviating the circumstances which necessitated the original placement.

(4) The appropriateness and feasibility of the current placement goal for the child.

child, the juvenile court is to consider, *inter alia*: (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility

_____

(5) The likely date by which the placement goal for the child might be achieved.

(5.1) Whether reasonable efforts were made to finalize the permanency plan in effect.

(6) Whether the child is safe.

. . . .

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
>
> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or
>
> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S. § 6351(f).

of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months.

*In re A.B.*, 2011 PA Super. 75, 19 A.3d 1084, 1088-89 (Pa. Super. 2011). Additionally, courts must consider whether reasonable efforts were made to finalize the permanency plan in effect. *See* 42 Pa.C.S. § 6351(f)(5.1).

*In Interest of L.T.*, *supra* at 1276-1277 (footnotes omitted).

Although Mother presents three distinct issues in her statement of issues involved, Mother's brief combines the latter two issues into one argument. She claims that the juvenile court erred when it concluded that reunification was neither appropriate nor feasible, and that Mother's compliance with her family service plan goals was only "moderate." Mother's brief at 9. Mother further contends that the court failed to appropriately weigh her progress towards alleviating the circumstances underlying P.H.'s dependency and placement. *Id*. at 10. Mother argues she was cooperating with CYS, maintaining appropriate housing, visiting with P.H., meeting her mental health needs, and had submitted to a mental health evaluation. *Id*. at 10. Mother claims CYS presented no evidence that she had not alleviated the issues surrounding P.H.'s placement, and assails the court for purportedly focusing on Mother's history rather than her progress. *Id*. at 11. In this context, Mother asserts the court erred in determining her compliance with her goals was moderate. *Id*. Further, Mother argues that although P.H. implored the court to make a decision between reunification and adoption at the May 25,

2018 permanency review hearing, the court's decision to change P.H.'s permanency goal to adoption was not in her daughter's best interests. Mother's argument is founded upon the fact that when P.H. told the court she wanted it to decide between returning her to Mother or moving towards adoption, P.H. was unaware that her current foster parents had determined they would not be an adoptive resource for P.H., as had a respite home where P.H. previously stayed. *Id*. at 11-13.

The juvenile court summarized its rationale for changing P.H.'s permanency goal to adoption as follows:

> We *sua sponte* changed P.H.'s goal from reunification to adoption because she had been in placement for twenty-six (26) months. She told us that she was tired of waiting. She was clear that her first choice was to go home with her mother. However, if that could not be accomplished that day, she wanted the goal to change and visits to stop. We were never in a position to feel that it would be safe to return her to Mother. We were hoping that Dr. Sh[ie]nvold could provide us with that comfort level. He could not. Therefore, we felt that a *sua sponte* goal change to adoption was the disposition best suited to the safety, protection and physical, mental, and moral welfare of P.H.

Juvenile Court Opinion, 8/27/2018, at 8.

At the time of the hearing, P.H. had been in foster care for more than two years. P.H. informed the juvenile court that she wanted the court to make a decision, stating, "I don't really want to wait any longer. I want it to be adoption or with my mom. I'm tired of waiting. I think it's been like a year or two years or so." N.T., 5/25/2018, at 6. While P.H. expressed her

- 14 -

preference to return to Mother, if the court determined returning to Mother would "not [be] the best idea," she would prefer adoption.  *Id*.

Following P.H.'s testimony, Kasey Shienvold, Psy.D., testified regarding his comprehensive psychological evaluation of Mother.  Dr. Shienvold observed that Mother had a difficult time being forthcoming at the evaluation.  N.T., 5/25/2018, at 13.  Mother refused to discuss certain areas of inquiry because she was concerned about how the answers would be used against her.  *Id*.  For instance, she would not tell Dr. Shienvold where she worked or where her other child received childcare.[7]  *Id*. at 19.  Based on his evaluation, Dr. Shienvold concluded Mother has a paranoid personality disorder, which he described as a pervasive and enduring mistrust of the world.  *Id*. at 16-17.  Dr. Shienvold did not believe Mother would "get better" without strong supports in place and a willingness on Mother's part to engage in treatment.  *Id*. at 24.  Dr. Shienvold expressed concerns about her level of commitment and motivation to make substantial changes in how she interacts, parents, and relates to others.  *Id*. at 29.  Mother's personality disorder, in itself, did not inhibit Mother from parenting P.H., but he was concerned that her history showed she could not work cooperatively with anyone who had authority or decision-making power over her.  *Id*. at 17-18.  Further, her guardedness and

---

[7] Mother gave birth to another daughter, also with the initials P.H., in October 2017.  While the court adjudicated Mother's infant daughter dependent, she remains in Mother's home with services provided by CYS.

defensiveness made it nearly impossible for him to fully evaluate Mother's ability to provide a safe and stable environment due to her refusal to provide pertinent information. *Id*. at 18. He opined that her lack of cooperation makes it difficult to anticipate or predict that she would be cooperative going forward. *Id*. at 19. Dr. Shienvold believed Mother posed a risk due to her character and ingrained style, in that she refuses to provide information and would not commit to follow CYS's rules. *Id*. Further, he could not determine whether Mother's parenting style posed a risk of harm to P.H. because she did not share enough about herself to understand her parenting style. *Id*.

Additionally, Dr. Shienvold expressed concerns that Mother's relationships are transient and do not endure, and that this could carry over into her relationship with P.H. *Id*. at 25. Dr. Shienvold believed that if P.H. was returned to Mother and then removed again, it would increase the likelihood of P.H. developing attachment disorders, as well as relationship and behavioral issues. *Id*. at 26.

Following Dr. Shienvold's testimony, Gan Fry, a CYS caseworker, testified that Mother complied with some of her goals, including housing, mental health counseling, attending visits, and communicating with the agency. *Id*. at 35-36. Ms. Fry noted that Mother missed several visits with P.H. *Id*. at 31-32. Further, although Mother claimed to have employment, she did not inform Ms. Fry where she was working, despite leaving Ms. Fry a voicemail indicating she would do so. *Id*. Additionally, Ms. Fry testified that

Mother, after the court ordered her to provide childcare information for her infant daughter, gave names but no contact information. *Id*. at 34. The individuals who Ms. Fry could contact indicated they had not provided childcare. *Id*.

P.H. then presented the testimony of K.B., P.H.'s foster mother. K.B. noted that P.H. is happy in her home and excited to be in school and participate in activities. *Id*. at 40. However, she also observed that, when Mother's visits with P.H. occurred in a less supervised setting, P.H.'s negative behavior intensified, including P.H. making allegations of abuse against K.B. *Id*. at 40-41. Due to the allegations of abuse, K.B. acknowledged that her family decided they could no longer be an adoptive resource for P.H. *Id*. at 41.

While Mother asserts that she complied with her goals, the record demonstrates that despite the more than two years P.H. had been in foster care, Mother still refused to be forthcoming such that the court could determine she did not pose a threat to P.H. Mother's refusal to provide information regarding her job or childcare is indicative of her overall attitude. Although Mother claims her progress was more than "moderate," the record demonstrates that Mother still failed to provide information to CYS and Dr. Shienvold. Accordingly, the juvenile court determined Mother had not provided sufficient information to allow it to be confident that Mother could safely care for P.H. Further, P.H. herself expressed a desire for the court to

make a decision to either return her to Mother's care or move towards adoption. After more than two years in foster care, the juvenile court did not abuse its discretion when it concluded it was in P.H.'s best interest to change her placement goal to adoption.

For the foregoing reasons, we affirm the juvenile court's order changing P.H.'s permanency goal to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 01/24/2019